[No. 8961. Department Two. April 18, 1911.]

SCANDINAVIAN AMERICAN BANK, *Appellant*, v. E. W. JOHNSTON, *Respondent.*[1]

BILLS AND NOTES—BONA FIDE PURCHASER—HOLDER IN DUE COURSE —GOOD FAITH—BURDEN OF PROOF—STATUTES—CONSTRUCTION. The negotiable instruments act, Rem. & Bal. Code, § 3443, providing that a holder in due course is one who takes in good faith for value, and § 3450, providing that, if the title of one who negotiates a note is defective, the burden is upon the holder to prove that he is a holder in due course, must be construed in connection with § 3447, which provides that to constitute notice of an infirmity or defect in title, there must be actual knowledge thereof or of such facts that the taking of the note amounts to bad faith; hence, where the holder has established by undisputed evidence that it is a holder in due course without actual notice, the burden then devolves upon the maker to show that the holder was guilty of some act, neglect or inexcusable omission amounting to *mala fides* on its part sufficient to show dishonest dealing preventing it from being a holder in due course; negligence or the omission of precautions or the mere suspicion of an infirmity not being sufficient to constitute bad faith or to put upon inquiry.

[1] Reported in 115 Pac. 102.

SAME—EVIDENCE—SUFFICIENCY. Where the title to a note was defective by reason of fraud not discovered until after it was negotiated to a bank, and the bank established, by the undisputed evidence of disinterested witnesses, that it took the same before maturity for full value in good faith, it is entitled to a directed verdict as a holder in due course; and it is not evidence of bad faith or sufficient to put the bank on inquiry, and prevent a directed verdict, that the maker had previously negotiated to the same bank the notes of another person the title to which was claimed to be defective, where the prior transaction was closed and settled three months before the other note was in existence, and bore no relation to it, there was no occasion to prosecute any inquiry on the prior occasion, and inquiry would have disclosed nothing as to the note and transaction in question.

DUNBAR, C. J., dissents.

Appeal from a judgment of the superior court for King county, Neal, J., entered January 29, 1910, upon the verdict of a jury rendered in favor of the defendant, in an action on a promissory note. Reversed.

*Roberts, Battle, Hulbert & Tennant*, for appellant.
*Hart, Prigmore & Evans*, for respondent.

CROW, J.—Action by Scandinavian American Bank against E. W. Johnston, on a promissory note. From a judgment against it, the plaintiff has appealed.

The controlling assignment is that the trial judge erred in refusing to withdraw the case from the jury, and enter judgment in appellant's favor. The following facts appear from undisputed evidence: Some time in January, 1909, the respondent, E. W. Johnston, subscribed for $5,000 par value of the capital stock of the Electric Transportation Company, a corporation organized to operate a line of sightseeing automobiles on the streets of Seattle and motor boats on Lake Union, during the A.-Y.-P. Exposition. In part payment, respondent executed his note for $2,000 to the transportation company, which, being sold to a *bona fide* holder for value, was paid at maturity. On May 7, 1909, certain supplies consigned to the transportation company had reached Seattle,

upon which a large amount of freight and other charges was due. The Electric Transportation Company was a customer of the appellant bank where it then had on deposit a balance of about $2,000, but it needed $5,000 more to meet the freight and other charges. It then applied for a loan of $5,000; whereupon appellant refused to accept its note without security, but agreed to make the loan on its note indorsed by five or six wealthy business men of Seattle, its stockholders, of whom respondent was one. A $5,000 note of the transportation company, dated May 7, 1909, running to the bank as payee, due in ninety days, indorsed by several of the transportation company stockholders, was executed. Respondent refused to indorse this note, but on the same day did execute his $3,000 note to the transportation company, also due in ninety days, which he then and there delivered to it in payment of the remainder of his stock subscription. He testified that he then told the payee he did not want it to be sold or negotiated. This statement, although denied by other stockholders, we accept as true.

On the same day, May 7, 1909, the transportation company delivered to the bank the principal note for $5,000, indorsed by a portion of its stockholders, and as further and collateral security therefor, at the same time and as a part of the same transaction, also delivered to it respondent's $3,000 note, and two other notes of $1,000 each, previously executed and delivered to the transportation company by one Appleton in payment of his stock subscription. The bank accepted the principal and collateral notes, made the loan, and immediately placed $5,000 to the credit of the transportation company, which on the same day checked it out in payment of the freight and other charges. The transportation company passed into the hands of a receiver some time in the latter part of June, 1909. None of the notes have been paid, and the appellant bank commenced this action against the respondent, Johnston, on the $3,000 collateral note executed by him, and also another action against Appleton on the two

notes executed by him. We, on this date, file a separate opinion in the *Appleton* case, which is also in this court on appeal. *Scandinavian American Bank v. Appleton, post* p. 203, 115 Pac. 109.

The respondent, Johnston, in his answer, admitted the execution of his note, but alleged that his subscription to the capital stock had been procured by misrepresentation and fraud; that his $3,000 note, thereafter given in payment of such subscription, originated in fraud; that it was without consideration; that the appellant bank took it with knowledge of the facts constituting such fraud; and that it was not a *bona fide* holder. The jury, by their verdict in respondent's favor, necessarily found that the stock subscription, the consideration for the note, was obtained by fraud, and the only question we will consider is whether the appellant was entitled to a directed verdict upon the theory that it was a *bona fide* holder for value, having purchased the note before its maturity in due course.

The following facts indisputably appear from the evidence, and as we understand, are not challenged by respondent: That respondent executed and delivered his note to the transportation company in payment of his stock subscription; that it was on the same day delivered as collateral security to the bank, which then and there made a loan of $5,000 in cash to the transportation company on the principal note; that the bank at that time had no knowledge of any misrepresentations made to Johnston, or that his note had been fraudulently procured without consideration; that Johnston himself did not then know he had been defrauded, and that he did not learn the actual facts until the appointment of the receiver.

The jury, by its verdict, must have found the appellant was not a holder in good faith, and the only possible circumstance upon which it could have predicated such a finding was that about January 25, 1909, one C. H. Lilly, a prominent and wealthy business man of Seattle, also subscribed for capital stock of the transportation company, and in part

payment therefor executed and delivered to it his five promissory notes of $1,000 each; that two of these notes were forthwith sold to the appellant bank at par for value, it then becoming an unquestionable holder of them in due course and good faith; that about February 1, 1909, Lilly, claiming his notes had been procured by the misrepresentations of an employee of the transportation company, engaged to sell its stock, surrendered his stock to the company, and demanded a return of his notes, none of which had yet matured; that three were returned to him, but that he was advised by the company the other two had been sold to the bank. He then called upon the bank, and all notice or knowledge it obtained from him is shown by his testimony, which we accept as true, and which he gave as follows.

"(Examination in chief.) Q. Did you see Mr. Lane, the cashier of the Scandinavian American Bank? A. I did. Q. What did you tell him about those notes? A. I told Mr. Lane I wished to find out if they were holding certain notes of mine, and, if they were holding them, I wanted to arrange to have the Electric Transportation Co. take them up; that they had agreed not to cash them, and, inasmuch as they had an account there, as I understood, and plenty of money, I wanted to arrange it so I could get my notes back. Q. What did you tell him, if anything, about the company having secured them from you by misrepresentation? A. I told Mr. Lane they had misrepresented the facts to me to get those notes; and he stated he could not very well arrange to get the notes back, because they did not have a very large balance there; and he stated that they bought this note on the strength of my name being there and being perfectly good, but he did not know the facts about the purchase, and Mr. Woolfolk, I think, he referred me to as knowing the particulars of the purchase; I think, however, that Mr. Lane told me that Mr. Chilberg had passed on them. Someone else—he hadn't passed on it—as I remember—on the purchase of the note. Q. Now, when was it you were in the bank and made the protest about the notes and had the conversation with Mr. Lane? A. Well, it was somewhere about—well, four or five days after the dates on them. Q. You think it was four or five days after the dates on them? A. Yes, sir.

Q. That would be in the vicinity of February 1st, 1909? A. February 1st; and I think this note was due February 9th. (Cross-Examination) Q. So you told Mr. Lane they had misrepresented the matter to you by agreeing that they would not negotiate your notes? A. I told them they had misrepresented matters to me 'and also had agreed not to negotiate my paper; and he said they had already purchased these two notes; and he sent me back to talk to Mr. Woolfolk, and I actually saw the notes in their possession there in the hands of the man at the note counter—I forget that gentleman's name. . . . A. I went to see Mr. Lane to use a little personal influence and get him to help me get my notes, and if they had a fat bank account there I thought he could easily arrange it."

It further appears that, shortly thereafter, Lilly, without participation of the bank, effected some satisfactory arrangement with the transportation company, in pursuance of which it agreed to pay, and did pay, the two notes when they became due, and returned them to him. The only possible notice the bank had that these payments were made by the transportation company must be predicated upon the fact that one of them was paid by the company check drawn upon the appellant bank. It is apparent that appellant has many employees and transacts an extensive banking business. Nothing further occurred between Lilly and the bank. Both of the Lilly notes were paid before the collateral $3,000 note was executed by the respondent, Johnston. The sole question before us is whether any such notice of the Lilly transaction came to the bank as to demand an inquiry in regard to the origin of respondent's note, and whether the bank has been guilty of any such neglect in failing to prosecute an inquiry as will deprive it of the position and rights of a *bona fide* holder of the collateral note. Although the cashier and other employees of the bank denied Lilly's statements, we, as above stated, accept them as true.

Respondent, citing § 3443, Rem. & Bal. Code, defining a holder in due course; § 3446 defining defective title; § 3447, defining notice of defective title, and § 3450, relating to de-

fenses against the claim of a holder in due course; and also citing *Ireland v. Scharpenberg*, 54 Wash. 558, 103 Pac. 801, and other cases upon which he relies, contends that the question whether the appellant was a *bona fide* holder in due course was for the exclusive consideration of the jury; that the cashier was an interested witness; and that his credibility was also for the jury. There is no question but that, upon an issue of fact, conflicting evidence must be submitted to the jury for its consideration. Nor can it be disputed that the credibility of the bank cashier, an interested witness, would be for the jury were his evidence unsupported, improbable, and necessary to sustain a finding of *bona fides*. In this case the cashier's evidence could be entirely eliminated and yet, under our interpretation of the law, it would appear indisputably from the evidence before us that the bank was in fact a *bona fide* holder for value in due course. In the *Scharpenberg* case the only evidence relied upon to show the title and good faith of the plaintiffs as endorsees was oral testimony of themselves, given without the corroboration of records of their business or other circumstances. Speaking of their statements, we said:

"There was no evidence as to the manner, consideration, or time of purchase of the note by the respondents, save that given by themselves. Frank N. Ireland testified as to the amount paid for the note, and that it was purchased of Robert Burgess & Son, August 1, 1907, without any notice of there being any defense thereto. It will be noticed that this was after interest was some three months in default, but before maturity of the first installment. Charles Ireland testified to substantially the same effect, but he admitted upon cross-examination that the knowledge he had in this respect was gained from their records, and it was from them he was testifying. No record was produced, so we have no competent evidence of the purchase, or time of purchase, of this note save that of Frank N. Ireland, who, of course, is a witness directly interested in the result of the cause. His testimony in this regard was not contradicted by any direct evidence. There was, however, the circumstance of the interest being in

7—63 WASH.

default some three months, as well as other minor circumstances which the jury would have been warranted in taking into consideration in weighing the testimony of Frank N. Ireland, even though not directly contradicted, had the cause been submitted to them.   In other words, the jury would not have been required to take the testimony of Frank N. Ireland in this regard as conclusive proof, *and there was no other upon that question.*"

In this case there is no dispute as to the time the bank acquired the note, the consideration paid, nor of any other fact tending to show that it became a holder before maturity and for value.   The only question is its *bona fides* or *mala fides*, in acquiring title.   Our holding in the *Scharpenberg* case, that the question of the *bona fides* of the plaintiffs and their credibility was for the jury, was predicated upon the evidence then before the jury and mentioned in the opinion.   In making our conclusion, we cited *Canajoharie Nat. Bank v. Diefendorf*, 123 N. Y. 191, 25 N. E. 402, 10 L. R. A. 676, and other authorities which follow that case.   In the New York case, the conduct of the cashier was shown to be such as to indicate a deliberate intention upon his part to studiously avoid knowledge, which he manifestly anticipated would disclose the defective title of the payee.   The facts are stated in the opinion. This New York case has, on similar evidence, been repeatedly followed by this and other courts, but the court of appeals of New York itself distinguished it in *American Exchange Nat. Bank v. New York Belting & Packing Co.*, 148 N. Y. 698, 43 N. E. 168, a case similar to this, in which it held that judgment should be directed against a maker in favor of a plaintiff endorsee as a *bona fide* holder in due course.   In the *Canajoharie Bank* case, the court said:

"The payment of value for negotiable paper is a circumstance to be taken into account with other facts, in determining the question of the *bona fides* of the transaction, and when full value is paid, is entitled to great weight.   But that fact is never conclusive, *except in the absence of evidence tending to show notice or bad faith.*"

Although subd. 3 of § 3443, Rem. & Bal. Code, in defining a holder in due course, provides that he shall have taken the instrument in good faith, and § 3450 provides, when it is shown that the title of the person who has negotiated the instrument is defective, the burden is on the holder to prove that he, or some person under whom he claims, acquired the title as holder in due course; and although under § 3446 the title of the transportation company to this instrument must be regarded as defective, these sections, being each and all in our negotiable instruments act, must be considered in connection with § 3447, Rem. & Bal. Code, of the same act, which reads as follows:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

In other words, if an endorsee for value before maturity did not have actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith, he would, so far as that question is concerned, be held a holder in good faith, no *mala fides* being shown. In *Gray v. Boyle*, 55 Wash. 578, 104 Pac. 828, 133 Am. St. 1042, commenting on this section and quoting with approval from Crawford's Annotated Negotiable Instruments Law, we said:

"The respondent purchased the note for value before maturity, and at the time of his purchase had no notice of any defect or infirmity in the instrument. The chief circumstance upon which the appellant relies to establish *mala fides* is the fact that the respondent knew that Behan was an insurance agent, and that the note was given in whole or in part in payment for an insurance premium. The rule by which the good faith of a holder of negotiable paper is to be determined is thus stated in Crawford's Annotated Negotiable Instruments Law (3d ed.), p. 68: 'The holder is not bound at his peril to be on the alert for circumstances which might pos-

sibly excite the suspicion of wary vigilance; he does not owe to the party who puts the paper afloat the duty of active inquiry in order to avert the imputation of bad faith. The rights of the holder are to be determined by the simple test of honesty and good faith, and not by a speculative issue as to his diligence or negligence. The holder's right cannot be defeated without proof of actual notice of the defect in title or bad faith on his part evidenced by circumstances. Though he may have been negligent in taking the paper, and omitted precautions which a prudent man would have taken, nevertheless, unless he acted *mala fides*, his title, according to settled doctrines, will prevail.' This rule is fully supported by the authorities, and, measured by it, the title and good faith of the respondent were not impeached."

In *McNamara v. Jose*, 28 Wash. 461, 68 Pac. 903, on issues of fact similar to those now before us, we sustained the action of the trial judge in withdrawing the case from the jury at the close of all the evidence, and directing a judgment for the plaintiff. In our opinion, citing and commenting on §§ 56 and 57 of the negotiable instruments act, Laws 1899, p. 350 (Rem. & Bal. Code, §§ 3447, 3448), we said:

"But, notwithstanding this act positively provides that, to constitute notice of an infirmity in a negotiable instrument, the purchaser must have knowledge of such facts that his action in taking the instrument amounted to bad faith, we cannot think that the legislature meant to say that a purchaser of a negotiable instrument can shut his eyes to the surrounding circumstances, remain in willful ignorance of facts which would have made known to him the infirmities of the instrument he purchases, and then claim, because he had no actual knowledge of such infirmities, that his title thereto is unimpeachable; but that it is still the rule that willful ignorance and guilty knowledge alike involve the result of bad faith. This, however, does not mean that the holder's title is to be overthrown by slight circumstances. He does not owe to the party who puts the paper afloat the duty of active inquiry in order to avert the imputation of bad faith. His rights are to be determined by the simple test of honesty and good faith, not by a speculative inquiry into diligence or

negligence. Although he may have been negligent in taking the paper, and omitted precautions which a prudent man would have taken, nevertheless, unless he acted *mala fide,* his title will prevail."

In *Jamieson & McFarland v. Heim,* 43 Wash. 153, 86 Pac. 165, we held that fraud in the inception of a negotiable instrument will not invalidate it in the hands of an innocent holder in due course. The question arises, What knowledge did the appellant have of any infirmity in the title of the transportation company to the respondent's $3,000 note? We do not understand any claim is made that it had actual notice. The respondent himself testified as follows:

"Q. Captain Johnston, I understood you to say that at the time you signed this $3,000 note on May 7, 1909, that you had no knowledge of any fraudulent transactions upon the part of the company? A. No, sir; I did not. Q. Now, will you kindly tell the jury then, Captain, as near as you can, the date when you first discovered any fraudulent transactions? A. Why, I cannot tell; it was some time, I think, in there; some time in June, or the latter part of May, that Mr. Zintheo came to my house and wanted me to buy some more stock. Q. So that you had no information or notice that these fraudulent schemes were made until after that time—in June—early in June or late in May? A. No, sir; I don't think that I did."

If respondent was ignorant of the alleged misrepresentations and fraud, which he now claims vitiated the title of the transportation company, and his ignorance continued until after appellant had acquired the note, how could the appellant be presumed to have obtained actual knowledge as to the origin of this particular note before obtaining title? There is not a syllable of evidence that appellant did. Lilly's statement, as disclosed by his evidence, did not give the bank notice or knowledge of such facts as to show its bad faith in taking the note. It is conceded that the bank had in good faith, without notice, in due course and for value, purchased the Lilly notes before his interview with the bank. The bank

then had good title to the Lilly notes. There was no occasion demanding an investigation of those notes, nor an investigation of his dealings with the transportation company. Assuming that the bank had then prosecuted an investigation, it could have learned nothing questionable in the dealings between Johnston and the transportation company. The Johnston note was not then in existence, nor was it executed for more than three months thereafter. The Lilly notes were paid before respondent's note was executed. So far as the bank was concerned, the Lilly matter was a closed incident, satisfactorily closed, and calling for no further consideration. The transportation company and Lilly had settled their differences. The Lilly transaction had no relation whatever to respondent's note, executed three months later. Were it conceded to have been a circumstance sufficient to excite some suspicion as to the character of the dealings and acts of the transportation company, we could not, under the weight of modern authority, hold the appellant to have acted in bad faith, or that it was negligent in making no further investigation than it did. In other words, there is not, in the entire record, any suggestion of *mala fides* on appellant's part.

Some contention is made by respondent to the effect that, at the time appellant made the $5,000 loan to the transportation company, it knew the company was insolvent. This contention is based upon the admitted fact that a written statement was made to the bank by the transportation company, showing that its liabilities, some of them not due, exactly equalled its claimed assets, but in which no statement relative to its capital stock appeared. The transportation company was then, and for some time had been, a going concern, transacting business and carrying a substantial depositor's account with appellant. The bank does not contend that it made the loan on the credit of the company. On the contrary, it admits that it refused to do so. The loan was made on the credit of the endorsers of the $5,000 note and the col-

lateral security, including respondent's note.   There was
nothing suspicious in the fact that the bank made the loan
to a going corporation on good security.   It was immaterial,
as affecting the honesty and good faith of the bank, whether
the transportation company was worth anything, so long as
its stockholders, most of them men of large wealth—a fact
known to the bank—were willing to endorse for it, or had
given it their notes which it could and did use as collateral.
The loan, from the standpoint of the bank, was gilt-edged,
and free from any suspicious circumstance.   If the trans-
portation company was then actually insolvent, its stock-
holders, including respondent, were in a better position than
appellant to know or learn that fact, but they endorsed its
paper, gave it their personal notes, and permitted it to con-
tinue the transaction of its business, at the time knowing it
was procuring this identical loan of $5,000 from appellant
to raise funds for use in its business.

In *Bothwell v. Corum*, 135 Ky. 766, 123 S. W. 291, the
court of appeals, considering a section identical with § 3447,
Rem. & Bal. Code, *supra*, in a case similar to this, held on the
evidence offered, the trial court erred in refusing to peremp-
torily instruct the jury to find for the plaintiff.   The court
said:

"To constitute notice of an infirmity in an instrument or
defect in the title of the person negotiating the same, the
person to whom it is negotiated must have actual knowledge
of the infirmity or defect, or knowledge of such facts that his
action in taking the instrument amount to bad faith.   Ky.
St. Sec. 3720b, sub-sec. 56.   The proof in this case fails to
come up to either one of these requirements of the statute.
There is nothing in the case to show that appellant had actual
knowledge of the infirmity or defect, or knowledge of such
facts that his action in taking the instruments amounted to
bad faith.   On the contrary, his evidence, which is unim-
peached by that of any other witness or by any circumstances
in the case, tends to show that he acquired the drafts before
maturity, for value, and without notice of any infirmity there-
in or defect in the title of the American Jobbing Association,
which indorsed, delivered, and sold the drafts to him."

It is well established by the overwhelming weight of modern authority that, if in an action on a negotiable note prosecuted by an endorsee, the maker alleges and shows the instrument to have been fraudulently obtained by the payee, it will then devolve upon the indorsee to show that he is a *bona fide* holder for value, and that he obtained the note before maturity in due course, and without knowledge of the infirmity, or of facts sufficient to put him on inquiry. But it is equally well established that mere suspicion of an infirmity is insufficient to put the endorsee upon inquiry, or show that he is not a holder in good faith. *McNamara v. Jose*, 28 Wash. 461, 68 Pac. 903; *Gray v. Boyle*, 55 Wash. 578, 104 Pac. 828, 133 Am. St. 1042; *Sinkler v. Siljan*, 136 Cal. 356, 68 Pac. 1024; *Valley Sav. Bank of Middletown v. Mercer*, 97 Md. 458, 55 Atl. 435; *Wilson v. Riddler*, 92 Mo. App. 335; *Bank of Sampson v. Hatcher*, 151 N. C. 359, 66 S. E. 308, 134 Am. St. 989; *Jefferson Bank of St. Louis v. Chapman-White-Lyons Co.*, 122 Tenn. 415, 123 S. W. 641; *First Nat. Bank v. Moore*, 148 Fed. 953; *Reilly v. McKinnon*, 159 Fed. 78; *Hamilton Nat. Bank v. Upton*, 100 App. Div. 105, 91 N. Y. Supp. 475; *Second Nat. Bank v. Weston*, 172 N. Y. 250, 64 N. E. 949; *Kavanagh v. Bank of America*, 239 Ill. 404, 88 N. E. 171; *Fidler v. Paxton*, 101 Ill. App. 107; *Tescher v. Merea*, 118 Ind. 586, 21 N. E. 316.

In *Sinkler v. Siljan, supra*, the supreme court of California said:

"To say that one who purchases a note before maturity and pays full value thereof, as plaintiff did in this case, must be prepared to defend his purchase against all equities and defenses the maker might urge against the payee, if in the purchase 'the circumstances were such as to invite inquiry on the part of the purchaser,' is too broad a statement of the rule, and gives to the jury too uncertain and indefinite a guide. The rule in such cases as this is quite fully considered in *Eames v. Crosier*, 101 Cal. 260. It was there held that where fraud or illegality in the inception of the note is shown the burden is cast upon the indorsee to show that he is an innocent holder, and this he may do by showing that he pur-

chased the note before maturity, or from an innocent indorsee for value, in the usual course of business. 'When this is done, unless the evidence shows that the note was taken by the plaintiff under circumstances *creating the presumption that he knew the facts impeaching its validity*, the burden is cast upon the defendant to show, if he would defeat the plaintiff in his action, that the latter took the instrument with notice of the defendant's equities.' There is a marked difference, as we conceive, between circumstances 'such as to invite inquiry' and circumstances 'creating the presumption' that plaintiff knew the facts impeaching the validity of the note. It was said in *Collins v. Gilbert*, 94 U. S. 753, that to defeat the rights of a *bona fide* holder for value of a promissory note, claimed to have been procured by fraud, it must be shown, either directly or by circumstances, that he had notice of such infirmity. 'Proof of such facts and circumstances as would have put a reasonable man upon inquiry in relation thereto are not sufficient to constitute a defense to a suit by the holder.' "

The case of *Reilly v. McKinnon, supra,* is quite similar to this, it being there contended by the makers that their notes given in payment of stock subscriptions had been frequently obtained by the payee, and that the indorsee was not a holder in good faith. The court held a judgment should have been directed for the indorsee, and in discussing the evidence, said:

"But, as already stated, whatever the character of the company may have been, there is no evidence of a fraudulent conspiracy or any evidence to show that the plaintiff took the notes in question with knowledge of the alleged fraudulent representations, or with such notice of the facts and circumstances attending their execution that his acceptance of them must be deemed to have been done in actual bad faith. He was ignorant of the entire transaction. One may be a *bona fide* holder of commercial paper and entitled to protection as such, notwithstanding he had knowledge of circumstances that might excite suspicion in the mind of a cautious person, or even though he were grossly negligent at the time of the transfer; the test is, did he act in bad faith? This is generally accepted law, . . ."

In *Kavanagh v. Bank of America, supra*, the second syllabus reads as follows:

"Only bad faith will defeat the title of the endorsee of commercial paper taken before maturity, for value and without knowledge of any defenses thereto; and mere suspicion, the knowledge of circumstances calculated to excite suspicion, or even negligence of the endorsee in acquiring the paper, will not defeat his title."

In nearly all, if not all, of the cases above cited it was held that the plaintiff endorsee, upon the evidence, was entitled to a directed judgment or verdict in his or its favor as a *bona fide* holder. There is nothing in this case showing any bad faith or *mala fides* on appellant's part. Although it is true that, when the title of the transportation company was shown to be defective, the burden devolved upon the appellant to show it was a *bona fide* holder, yet after it had introduced evidence not in any manner contradicted or disputed, showing it to be such a holder, and completely disclosing all the circumstances surrounding the acquisition of its title, and when it appeard from its records, the records of the transportation company, and evidence of disinterested witnesses, that it had paid value for the note, and no circumstance suggesting *mala fides* on its part was disclosed by the evidence thus produced, it then devolved upon the respondent to show that the appellant was guilty of some neglect, wrongful act, or inexcusable omission, which amounted to *mala fides* on its part, sufficient to show its dishonest dealing and prevent it from being held a *bona fide* holder in due course. *Sinkler v. Siljan, supra*. If the evidence in this case indicated, as it did in *Ireland v. Scharpenberg* and *Canajoharie National Bank v. Diefendorf, supra*, that the appellant, when taking the respondent's note as collateral security, refrained from making any inquiry into its origin lest it might by means of such inquiry become acquainted with some fraudulent transaction out of which the note originated, sufficient to make the note defective, a different question would be presented. But no such evidence

appears.   There was no suggestion of anything suspicious relative to respondent's note, nor any facts known to appellant at the time sufficient to put it upon inquiry.   From the undisputed evidence before us, it appears that appellant was a *bona fide* holder for value in due course before maturity, and that a judgment should have been directed in its favor.

Reversed and remanded, with instructions to enter a judgment in appellant's favor.

CHADWICK and MORRIS, JJ., concur.

DUNBAR, C. J., dissents.