[No. 12056.    Department Two.    March 19, 1915.]

T. D. McLAUGHLIN, *Respondent*, v. J. H. DOPPS *et al.*, *Appellants*.[1]

BILLS AND NOTES—HOLDER IN DUE COURSE. A negotiable promissory note, indorsed and transferred by the payee to a creditor on an open account and accepted and applied by the creditor on the account as a *pro tanto* payment thereof, without any knowledge on the indorsee's part of any fraud in its inception, and without any showing of facts from which bad faith might be implied, constitutes the indorsee a holder in due course, and entitled to enforce the note against the makers thereof.

TRIAL—PROVINCE OF COURT AND JURY—BILLS AND NOTES—HOLDER IN DUE COURSE. Although the burden of proof is upon the owner of a negotiable instrument, if the title is shown to be defective, to prove that he, or some person under whom he claims, acquired title as a holder in due course, it is not error to withdraw the question from the jury and determine it as a matter of law, when the evidence is so clear and convincing that reasonable minds can draw but one conclusion therefrom.

SALES—FAILURE OF CONSIDERATION—SUFFICIENCY OF EVIDENCE. A failure of consideration for the giving of a promissory note on the sale of a stallion, warranted to get sixty per cent of producing mares with foal with proper care and handling, is not established by evidence showing that only forty-four per cent of the mares served produced foals, when there was no showing as to what proportion of the mares served were producing mares.

[1]Reported in 147 Pac. 6.

Appeal from a judgment of the superior court for Benton county, Kauffman, J., entered November 29, 1913, upon the verdict of a jury rendered in favor of the plaintiff, in an action on a promissory note. Affirmed.

*M. M. Moulton,* for appellants.
*Driscoll & Leonard,* for respondent.

MAIN, J.—The purpose of this action was to recover on a promissory note. The note was signed by nine individuals and one firm name. Summons was served upon all the makers of the note with the exception of three. Three general defenses were interposed on behalf of all of the defendants who were served with process: First, that the making of the note was induced by false and fraudulent representations; second, that there was a failure, or partial failure, of the consideration; and third, that the plaintiff was not a holder in due course. Three of the defendants who appeared interposed the defense that they had not signed the note. At the conclusion of the evidence, the trial court held that it was clearly shown that the plaintiff was a holder in due course, and directed a verdict, with the exception that there was submitted to the jury the question as to the signatures of the three defendants who were contesting upon this ground. The jury returned a verdict in favor of the plaintiff upon the question of the signatures. Judgment was entered against all of the defendants upon whom summons had been served, with the exception that no judgment was entered against the firm whose name appeared upon the note, but only against the individual member who had signed the firm name. From the judgment entered, five of the defendants have appealed.

The facts are briefly as follows: On April 3, 1906, at Kennewick, Washington, one W. R. Clemans, as agent of the Palo Alto Stock Farm, sold to a voluntary association of men a Percheron stallion named "Irresistible," for the price of $4,000. In payment of the purchase price, four

promissory notes were given for $1,000 each. The first note became due on September 1, 1907. The note which is the foundation of the present action became due on September 1, 1910. On April 5, two days after the execution and delivery of the notes, the Palo Alto Stock Farm gave a warranty as to the horse. This warranty contained the provision that, "if the above named stallion (Irresistible) does not get sixty per cent of the producing mares with foal with proper care and handling, or seventy-five per cent with proper use of the impregnator, we agree to replace him with another stallion of the same breed and price, upon delivery to us of said stallion in as sound and as good condition as he is at present."

This warranty also contained the provision:

"This is the only contract or guarantee given by us and it is not to be changed or varied by any promise or representations of the agent."

In the spring of the year 1907, the president of the voluntary association wrote the Palo Alto Stock Farm that the horse had not produced as many colts as had been expected, and suggested that another horse be substituted in his place before the opening of the season of 1907. In reply to this letter, the Palo Alto Stock Farm, by N. W. Thompson, its manager, wrote and suggested that the horse be kept another season, expressing the belief that he would prove satisfactory upon a further trial; also stating that the Palo Alto Stock Farm at that time did not have on hand as good a horse that could be exchanged. The horse was retained and used during the year 1907, and every season thereafter up to the time of the trial of this action, which was on November 29, 1913.

On January 31, 1908, the note here sued upon, together with two of the other notes, were sold by the Palo Alto Stock Farm to McLaughlin Brothers, whose principal place of business was Columbus, Ohio, but conducted a branch office at St. Paul, Minnesota. The St. Paul office was under the management and control of T. D. McLaughlin, who was not a member of the firm of McLaughlin Brothers, but was a

brother of the members of that firm. McLaughlin Brothers were in the business of importing high grade stallions, and then selling them in carload lots to retailers. The Palo Alto Stock Farm was a retailer and sold horses direct to farmers or associations of farmers. McLaughlin Brothers, through their St. Paul office, had sold horses to the Palo Alto Stock Farm from time to time covering a period of years. They were generally sold upon account and not for cash. McLaughlin Brothers kept an open account with the Palo Alto Stock Farm, and the latter also kept an account of its transactions with McLaughlin Brothers. On January 31, when the notes mentioned were sold to McLaughlin Brothers, the Palo Alto Stock Farm owed that firm practically $12,000. At the time the three Kennewick notes were sold, other notes aggregating $7,000 were transferred, making a payment of $10,000 in all upon the account.

On February 28, 1908, the president of the Kennewick Stock Breeders Association, which was the voluntary association to which the horse had been sold, wrote the Palo Alto Stock Farm that there had come to the knowledge of the members of the association within a few days last past that there had been misrepresentations and fraud in the sale of the horse to them, in that certain members of the association who had signed the note had been, by the agent Clemans, given a special contract intended to relieve them from liability as members of the company; and also that there had been a breach of the warranty as to the stallion Irresistible. The letter concluded with a notification that the contract was rescinded, and that the horse was held subject to the order of the Palo Alto Stock Farm. Notwithstanding this letter, as already stated, the horse was retained and used each succeeding season thereafter by the Kennewick Stock Breeders Association.

The controlling question in this case is whether the plaintiff was, as a matter of law, a holder in due course of the note sued upon. The suit was originally instituted by the Ger-

man-American National Bank. After the suit had been begun, T. D. McLaughlin was substituted as party plaintiff. If McLaughlin Brothers, at the time they purchased the note on January 31, 1908, were holders in due course, T. D. McLaughlin is in the same position. To determine whether McLaughlin Brothers became holders in due course, an examination of the evidence is necessary.

T. D. McLaughlin testified that, at the time of the sale of the note, the Palo Alto Stock Farm was owing McLaughlin Brothers approximately $12,000; that the note was taken as a payment on the account; that at the time of the purchase, he examined a rating of the makers thereof made by a bank at Kennewick; that he had no knowledge of any infirmity in the note; that McLaughlin Brothers, covering a period of years, had sold horses to the Palo Alto Stock Farm, and had generally taken notes in payment of the account; that the notes taken upon this occasion were the only ones that they had ever received from the Palo Alto Stock Farm upon which it was necessary to bring suit in order to collect; that he had no other means of collecting the note other than from the makers thereof.

The books of McLaughlin Brothers and also of the Palo Alto Stock Farm, showing the accounts between the two concerns, were introduced in evidence. McLaughlin Brothers' account shows the purchase of the notes, and that credit was given the Palo Alto Stock Farm therefor. The Palo Alto Stock Farm books show the transfer of the notes to McLaughlin Brothers and the latter firm is charged with the amount thereof upon the account.

N. W. Thompson, manager of the Palo Alto Stock Farm, was not produced as a witness, but it was admitted upon the trial that if he were present he would testify that the notes were transferred to McLaughlin Brothers for value and in good faith.

One C. H. Keller, by deposition, testified that, at the time of the taking of his deposition, to wit, August 19, 1913, he

was residing at Oakland, California, and was an attorney at law; that on January 31, 1908, when the note in question, together with the other two notes, were transferred from the Palo Alto Stock Farm to McLaughlin Brothers, he was the bookkeeper for the latter firm at the St. Paul office; that he had had no connection with the firm of McLaughlin Brothers since July 1, 1912, and had no interest in the outcome of the litigation; that the notes were purchased by McLaughlin Brothers, and taken as payment upon the account; that he made the entry upon the books of McLaughlin Brothers showing the transaction; that at the time of the transfer, he, together with T. D. McLaughlin and Thompson, examined the rating as to the financial standing of the defendants; that, at the time of the transfer of the notes, the Palo Alto Stock Farm owed McLaughlin Brothers approximately $12,000; that at the time the notes were purchased, inquiry was made of Thompson if there were any reasons why the notes would not be paid promptly when due, and were assured by Thompson that the notes were first class paper, and would be promptly paid.

The law applicable to these facts will now be noticed. Under the provisions of the negotiable instruments act, when the title to a negotiable instrument is shown to be defective in the person negotiating it, the burden is upon the owner of the instrument to prove that he, or some person under whom he claims, acquired title as a holder in due course. Rem. & Bal. Code, § 3450 (P. C. 357 § 117); *Keene v. Behan,* 40 Wash. 505, 82 Pac. 884; *Cedar Rapids Nat. Bank v. Myhre Bros.,* 57 Wash. 596, 107 Pac. 518; *Scandinavian American Bank v. Johnston,* 63 Wash. 187, 115 Pac. 102; *Union Inv. Co. v. Rosenzweig,* 79 Wash. 112, 139 Pac. 874. The burden being on the plaintiff to show that he was a holder in due course, the question may be withdrawn from the jury and determined as a matter of law, when the evidence is clear and convincing and of such a nature that reasonable minds can draw but one conclusion therefrom. *Richmond v. Tacoma*

*R. & P. Co.*, 67 Wash. 444, 122 Pac. 351; *Union Inv. Co. v. Rosenzweig, supra.*

In the case of *Scandinavian-American Bank v. Johnston, supra*, the plaintiff, as a holder in due course, had brought an action upon a promissory note. The defense was fraud in the inception of the note. The trial court submitted to the jury the question as to whether the plaintiff was a holder in due course. In that case, in addition to the evidence of interested witnesses and the books, there was evidence of disinterested witnesses that the bank had paid value for the note, and no circumstances suggesting *mala fides* on the part of the bank were disclosed by the evidence. There was no evidence showing that the bank was guilty of any neglect, wrongful act, or inexcusable omission which amounted to *mala fides* on its part. It was there said:

"There is nothing in this case showing any bad faith or *mala fides* on appellant's part. Although it is true that, when the title of the transportation company was shown to be defective, the burden devolved upon the appellant to show it was a *bona fide* holder, yet after it had introduced evidence not in any manner contradicted or disputed, showing it to be such a holder, and completely disclosing all the circumstances surrounding the acquisition of its title, and when it appeared from its records, the records of the transportation company, and evidence of disinterested witnesses, that it had paid value for the note, and no circumstances suggesting *mala fides* on its part was disclosed by the evidence thus produced, it then devolved upon the respondent to show that the appellant was guilty of some neglect, wrongful act, or inexcusable omission, which amounted to *mala fides* on its part, sufficient to show its dishonest dealing and prevent it from being held a *bona fide* holder in due course."

In that case it was held that the bank was a holder in due course, and the judgment was reversed and the cause remanded with direction to enter a judgment in favor of the plaintiff.

The evidence in the case now under consideration is equally as convincing as the evidence in that case. The defendant of-

fered no evidence to combat the evidence offered by the plaintiff to establish good faith in the transaction. There are no facts or circumstances from which it could reasonably be inferred that the note was not transferred in good faith and for value. We think the facts in this case bring it within the holding in the case just referred to.

The appellants cite a number of cases which they claim sustain their position, that the question of good faith in the transaction should have been submitted to the jury. Of these cases, the one most nearly in point upon the facts is *Union Inv. Co. v. Rosenzweig, supra.* But that case is distinguishable from the present. There the Union Investment Company, a banking institution, took the note sued upon as indorsee from one of its bank customers. The bank had theretofore extended, and, at the time of the transfer of the note, was extending credit to this customer. The excerpts from the account books showed the account of the indorsers varied from day to day as they drew therefrom and added thereto, and that the note was collateral to the general account. There was no evidence that the indorsers were insolvent. On the contrary it appeared they were carrying on an extended and profitable business. The bank knew the purported consideration of the note, and knew, prior to the commencement of the action thereon, that the makers of the note claimed that the note was procured from them by fraud, and that there was want of consideration for it. With knowledge of these facts, the bank, instead of pursuing the indorsers of the note who were in the state where it conducted business, chose to pursue the makers of the note in a distant state after knowledge that such makers were under no obligation to pay it. In addition to this, the witnesses by which it was sought to show the good faith of the transaction were interested in the result of the action. In that case the question of the good faith in the transaction was by the trial court submitted to the jury, and it was held: "That the court did not err in

15—84 WASH.

submitting the question of the appellant's good faith to the consideration of the jury." In the present case, there is evidence of a disinterested witness supporting the good faith of the transaction; there is evidence that the holder of the note had no means of collecting it other than from the makers thereof; that the indorser of the note was not located in the same state as was the indorsee; that from the letter written by the president of the Kennewick Stock Breeders Association on February 28, 1908, it appears that only a few days before that letter was written had it come to the knowledge of the members of the association that there had been fraud in the inception of the note. The note was transferred on the 31st of January prior. If the makers of the note had not discovered the fraud prior to the time when the note was sold to McLaughlin Brothers, there seems to be no theory, under the facts in this case, which would justify the charging of that knowledge to the indorsee. The other cases cited by the appellants are clearly distinguishable upon the facts from this case.

On the question of the failure of consideration, this claim was based upon the fact that the stallion did not get with foal sixty per cent of the mares which he served, but only about forty-four per cent. The language of the warranty was that the stallion would "get sixty per cent of the producing mares with foal." There is no evidence showing what proportion of the mares served by the stallion were producing mares. It requires no argument to show that every mare which will receive the service of a stallion is not necessarily a producing mare. The appellants failed in their attempt to show failure of consideration. The horse was admittedly a good one, and the only objection to him appears to have been that he did not produce the number of colts which the purchasers claimed they were entitled to under the warranty.

The judgment will be affirmed.

Fullerton, Mount, Crow, and Ellis, JJ., concur.