Erle G. SWANSON and Helen F. Swanson, Appellants,

v.

COMMERCIAL ACCEPTANCE CORPORATION, Appellee.

No. 20908.

United States Court of Appeals
Ninth Circuit.

June 23, 1967.

Denton G. Burdick, Jr., Hutchinson, Schwab & Burdick, Portland, Or., for appellants.

Borden F. Beck, Jr., Black & Apicella, Portland, Or., for appellee.

Before HAMLIN, BROWNING, and ELY, Circuit Judges.

BROWNING, Circuit Judge:

Erle G. Swanson and his wife filed this diversity action against The Fuline Corporation and the Commercial Acceptance Corporation seeking rescission of two promissory installment notes executed by the Swansons in part payment of the purchase price of sixty Fuline automatic hot drink dispensing machines, together with chattel mortgages on the machines securing the notes. The notes and mortgages are held by Commercial. The claim for rescission is based upon alleged breach by Fuline of a warranty of fitness of the dispensing machines for their intended purpose.

Commercial counterclaimed for judgment upon the unpaid balance of the notes on the ground that it is a holder in due course and therefore took the notes free of the Swansons' breach of warranty defense against Fuline.[1]

The issue of Commercial's status as a holder in due course was segregated for trial, and judgment was ultimately entered in Commercial's favor. The Swansons have appealed.

The Swansons contend that Commercial was not a holder in due course because of its participation in the transaction resulting in the execution of the notes, and because the notes were endorsed to "Commerce Acceptance Company, Inc."

I

The facts relevant to the Swansons' first contention may be briefly stated.

Commercial, which is entirely independent of Fuline, is engaged in the business of purchasing commercial paper, and buys such paper from a large number of businesses. Prior to the present transaction Commercial, in the regular course of its business, purchased from Fuline paper similar to that involved here on a transaction-by-transaction basis. Fuline's paper constituted about

---

1. At the pertinent times the Negotiable Instruments Law was in effect in each of the states whose law might be applicable (Kansas, Missouri, Oregon, and Washing- ton), and the parties agree that there is no difference in the case law of these jurisdictions relevant to this issue.

ten per cent of Commercial's total purchases.

Late in April 1962, Fuline and the Swansons tentatively agreed to the sale of dispensing machines to the Swansons at a stipulated price, payable fifteen per cent down and the balance in installments over a three-year period. Commercial had no dealings with the Swansons in connection with this agreement: it did not participate in the negotiations; it made no representations to the Swansons; and had no knowledge of any representation Fuline may have made.

The agreement was conditioned upon approval of the Swansons' credit. The Swansons submitted a credit application to Fuline, supported by a financial statement and verification of their bank balance. Fuline tendered the credit application and accompanying papers to Commercial and another independent financing company together with information as to the sales price, down payment, finance charges, and proposed monthly payments. Commercial approved the application on May 1.

The decision to sell the equipment to the Swansons, the decision as to the terms and conditions of sale, including the decision to accept the Swansons' notes and mortgages for the unpaid balance, were "made solely by Fuline upon its own responsibility and not subject in any respect to the control of Commercial." Fuline was not obligated to sell the Swansons' paper to Commercial, but was free to transfer it to whomever it determined in its sole discretion. As noted, having secured the Swansons' agreement to the installment purchase on May 1, Fuline negotiated with another financing company, unrelated to Commercial, regarding the purchase of Swansons' paper.

The Swansons executed the first of the notes and mortgages in suit on June 12, 1962,[2] using blank note and mortgage forms supplied to Fuline earlier by Commercial. The blanks were completed by Fuline in accordance with the earlier agreement with the Swansons. The note was payable to Fuline at Fuline's offices, and Fuline remained free to sell the note to whomever it chose. Fuline sold the note and mortgage to Commercial the following day.

The Swansons rely upon a number of cases, led by Commercial Credit Co. v. Childs, 199 Ark. 1073, 137 S.W.2d 260, 128 A.L.R. 726 (1940), which deny holder in due course status to a financing company because of the nature and extent of its participation in the installment sale which produced the negotiable paper.[3] Commercial relies upon a sizable number of decisions affording a financing agency holder in due course immunity from the maker's defenses on facts which are difficult or impossible to distinguish.[4]

---

2. A second note and mortgage covering the balance due on additional machines was executed later by the Swansons and sold by Fuline to Commercial, under essentially similar circumstances.

3. These decisions rest upon a finding of principal-agent relationship between the financing agency and the installment seller; or on a finding that the financing agency was in any event so involved in the transaction that it should be treated as an original party and not as a subsequent purchaser; or on a holding that the circumstances justified the conclusion that the finance company did not take the negotiable instrument "in good faith" as required by Negotiable Instruments Law § 52(3).

The only question presented in this case is whether Commercial was in effect a party to the original transaction. The Swansons concede that Fuline was not acting in the transaction as Commercial's agent. They also concede that Commercial was not aware of any defect in Fuline's title to the notes or of any defense against Fuline in the Swansons' favor, and therefore took the notes "in good faith" within the meaning of N.I.L. § 52.

4. Both lines of authority are collected in Annot., 44 A.L.R.2d 8, 134–57 (1955), 4 A.L.R.2d Later Case Serv. 929 (1965); and are the subject of recent comment in Littlefield, Good Faith Purchase of Consumer Paper: The Failure of the Sub-

These divergent lines of cases reflect an underlying conflict in policy considerations. The first group gives controlling weight to preventing misuse of negotiable instruments to deprive installment purchasers of legitimate defenses against unscrupulous or insolvent sellers. These decisions subject the financing agency to the installment buyer's defenses on the ground that it is in a better position than the buyer to determine the responsibility and solvency of the seller to bear the expense and loss resulting from misjudgment. The second line of authority accords determinative importance to the maintenance of a free flow of credit. These decisions protect the financing agency from purchaser defenses on the ground that this is necessary to assure easy negotiability and thus the availability of the rapid financing required in a vigorous economy.

■ In the present case the district court held that a financing company should be denied holder in due course status if it was a moving party in the sales transaction itself and thus in substance an original party to the note which the sale produced; but that a financing company should be accorded holder in due course status if it was a business entity separate and apart from the seller and confined itself to extending a line of credit upon being presented with an acceptable business venture. The district court concluded that Commercial fell in the latter category, and that it was therefore a holder in due course.

This view of the law and the facts represents a median position, responsive in some measure to both of the conflicting policy considerations involved. We are not prepared to reject the district court's determination that it reflects the rule which an uncommitted state supreme court would probably adopt.[5] True, it may not achieve a proper accommodation of the opposing interests in all situations. But an uncommitted state supreme court might well conclude that greater harm would result from a test which pressed available legal doctrines to either extreme, and that creation of a more flexible and discriminating approach in this area of the law must be left to legislative action.[6]

II

■ The Swansons' second contention is disposed of by the district court's factual conclusion, not challenged here, that it was the understanding of the

---

jective Test, 39 S.Cal.L.Rev. 48, 68–74 (1966); 10 Vill.L.Rev. 309, 311 (1965); 65 Colum.L.Rev. 733, 734–35 (1965); 51 Ky.L.Rev. 134, 136–40 (1962); 55 Nw. U.L.Rev. 301, 395 (1960); Britton, Bills & Notes 283 (1961).

5. See note 1. Cf. Bellon v. Heinzig, 347 F.2d 4, 6 n. 3 (9th Cir. 1965); Minnesota Mut. Life Ins. Co. v. Lawson, 377 F.2d 525, 526 (9th Cir. 1967).

6. "This is a legislative problem of the purest form and courts are ill-equipped to take the broad social factors into consideration in a more than perfunctory manner." Willging, Installment Credit: A Social Perspective, 15 Catholic U.L. Rev. 45, 62 (1966). See also, Mindell, Some Major Legal Problems in the Installment Sales Field, 20 Personal Finance L.Q.R. 52 (Spring 1966); 55 Nw.U.L.Rev. 301, 402 (1960); 65 Colum. L.Rev. 733 (1965).

The many relevant state statutes are compiled and analyzed in Curran, Trends in Consumer Credit Legislation 312–22, col. 1, (1965); 12 Vill.L.Rev. 643 (1967); 7 U.C.L.A.L.Rev. 623 (1960); Hogan, A Survey of State Retail Installment Sales Legislation, 44 Cornell L.Q. 38 (1958); 58 Colum.L.Rev. 854 (1958).

None of these statutes base coverage upon the nature and extent of the financing agency's participation in the installment sale. Substantially all of them limit coverage in one or more of the following respects: to chattels bought for use primarily for personal, family, or household purposes, and not for resale; to sales involving less than a specified dollar amount; to secured transactions; or to transactions in which abuse has been most common, such as automobile sales and the financing of home improvements. The statutes utilize a wide range of remedial techniques other than limitations upon the use of negotiable instruments.

Swansons, Fuline, and Commercial that if Commercial did purchase the notes from Fuline they would be transferred to Commercial on proper endorsements by Fuline; and that the designation of "Commerce Acceptance Company, Inc." as the endorsee of the notes was due to a mutual mistake by Fuline and Commercial. Commercial is a wholly owned subsidiary of Commerce, and it is evident that the wrong printed forms were inadvertently selected.

We agree with the district court that N.I.L. § 43, and the decisions cited at 11 Am.Jur.2d Bills and Notes § 352, n. 3, 4 (1963), afford sufficient authorization to protect intended endorsees from such an inadvertent clerical error; and that First Nat. Bank v. McCullough, 50 Or. 508, 93 P. 366, 17 L.R.A.,N.S., 1165 (1908), heavily relied upon by the Swansons, is distinguishable. This failing, we would sustain the district court's action on the basis of N.I.L. § 9(3). See Britton, Bills & Notes 427 (1961).

Affirmed.