[No. 3059-1. Division One. July 21, 1975.]

ROBERT A. MAYNARD et al, *Appellants*, v. JACK ENGLAND et al, *Defendants*, ARMAND J. RAVETTI et al, *Respondents*.

James C. Young, for appellants.

Douglas Millard, for respondents.

CALLOW, J.—Robert and Irene Maynard commenced this action alleging that they had been defrauded in the purchase of the corporate stock of Mabel's Tavern, Inc. The Ravettis counterclaimed on a negotiable note and mortgage given by the plaintiffs Maynard in the transaction. The plaintiffs subsequently alleged that the note and mortgage were usurious under the provisions of RCW 19.52. Prior to trial, a default judgment was granted as to one defendant and dismissals and covenants not to sue were obtained as to all other defendants except Mabel's Tavern, Inc. The matter proceeded to trial only upon the issues between the Maynards and the Ravettis. The findings adequately set forth the factual situation:

1. During the Summer of 1970, plaintiffs entered into negotiations for the purchase of all of the capital stock of Mabel's Tavern, Inc., a Washington corporation. A $76,000 price was agreed and a contract of sale executed.

2. As part of the sale price, plaintiffs made and delivered their negotiable promissory note in the amount of $22,000 to Mabel's Tavern, Inc. Said promissory note provided for installment payments of $250 per month commencing September 15, 1970, and interest on the declining balance at the rate of ten percent (10%) per annum. Said promissory note further provided for an award against the maker of all collection costs, including attorney's fees, in the event of the maker's default. Said note was secured by a mortgage in favor of Mabel's Tavern, Inc. to the following described real property in King County, Washington:

. . .

Said mortgaged property was the separate property of plaintiff Irene Maynard.

3. There is no satisfactory explanation of why the note and mortgage were made in favor of Mabel's Tavern, Inc., rather than in favor of Claude M. Groff and Ernest P. Warner, the parties who were selling their stock to plaintiffs. In any event, Groff and Warner have made no claim herein that the $22,000.00 was not to be credited against the purchase price. Plaintiffs were in fact given full credit for the entire face amount of the note as part payment of the purchase price.

4. Because it was necessary to the parties that a certain amount of cash be available at closing in order to pay certain agreed corporate obligations and for other purposes, and because the Maynards did not make any cash down payment, the sellers, through the broker of the tavern sale, Harrison Heerschap, and his associate, Durand Fooks, sought financing [of] the note and security. Fooks advised two separate mortgage brokers of the availability of the note and mortgage.

5. One of the mortgage brokers contacted by Fooks was Norman Dubinsky of Liberty Mortgage Co. Dubinsky discussed the note and mortgage with defendant and counterclaimant Armand Ravetti and showed Ravetti the real properties secured by the mortgage. Ravetti proposed to purchase the note and mortgage for Fifteen Thousand Dollars ($15,000.00) cash, provided that the mortgagor would provide the additional security of a quitclaim deed and power of attorney to record it in the event of the maker's default on the installment note. The additional security was provided, and the note was negotiated and the mortgage assigned to Ravetti by Mabel's Tavern, Inc., through the corporation's officers, Warner and Groff, on August 12, 1970. Ravetti then issued his Fifteen Thousand Dollar ($15,000.00) check to Liberty Mortgage, and those funds were disbursed, consistent with the sales agreement, by Liberty Mortgage.

6. Neither Ravetti (except for taking an assignment of the note and mortgage) nor Dubinsky met or dealt with any of the parties to, or others involved in, the tavern transaction, and neither was advised of the terms of sale or of any of subjects discussed during negotiation of the sale or of any inducements made to the Maynards for their purchase. Ravetti took assignment of the note without knowledge of any defense to it.

7. On or about August 28, 1970, the Maynards took possession of Mabel's Tavern, and thereupon determined that its business and financial condition had been misrepresented in certain respects by representatives of Harrison Heerschap Company, the broker. Throughout negotiations for the sale of the tavern, the Maynards never dealt directly with the sellers, but only through the broker.

8. The first communication between the Maynards and the Ravettis occurred at approximately the end of September or beginning of October, 1970, when Mrs. Ravetti called Mrs. Maynard about a delinquency in installment payments due on the promissory note.

9. The only payments made by the Maynards on their promissory note were as follows:

| Date | Amount |
| --- | --- |
| October 6, 1970 | $250.00 |
| October 15, 1970 | 250.00 |
| November 16, 1970 | 250.00 |

The Maynards are in default of their mortgage obligation.

10. Following the Maynards' filing of their action, the Ravettis elected to accelerate the balance owed under the Maynard note, and sued for the balance and for foreclosure of the mortgage.

Based upon the above findings, the trial court concluded, *inter alia*, that

1. Because of his participation through Dubinsky in drafting the original loan documents, Ravetti is not a holder in due course of the Maynard note.

2. Ravetti is not entitled to judgment on the promissory note from the Maynards.

3. Robert Maynard and Irene Maynard, individually, and the community composed of them have been unjustly enriched by Ravetti's advance of Fifteen Thousand Dollars ($15,000.00), for which Ravetti is entitled to judgment against the Maynards . . .

4. The Ravetti's mortgage described in Finding number 2 is the first and paramount lien upon the real property therein described and the whole thereof as security for the judgment and interest and costs hereinabove set forth, and the mortgage should be foreclosed and the property sold by the sheriff of King County, Washington, . . .

A judgment for $18,650.35 and a decree of foreclosure, based on these findings and conclusions, was awarded the defendants Ravetti on their counterclaim. The amount of the judgment included the $15,000 said to have unjustly enriched the plaintiffs Maynard, less payments to the Ravettis credited against the $15,000 principal, plus interest from November 17, 1970 to April 25, 1974.

Both parties appeal. Two issues are raised:

1. was the transaction involving the transfer of the plaintiffs' promissory note and mortgage usurious under RCW 19.52;

2. were the Ravettis holders in due course of the note executed by the Maynards.

■■ We first hold that, except as hereinafter discussed, the trial court's findings of fact are supported by the evidence. Findings of fact are verities on appeal if there is substantial evidence to support them. *Hays Merchandise, Inc. v. Dewey*, 78 Wn.2d 343, 474 P.2d 270 (1970); *Enterprise Timber, Inc. v. Washington Title Ins. Co.*, 76 Wn.2d 479, 457 P.2d 600 (1969). Findings of fact which are conclusions of law will be interpreted as such. *State v. Reader's Digest Ass'n*, 81 Wn.2d 259, 501 P.2d 290 (1972); *Hanson v. Lee*, 3 Wn. App. 461, 476 P.2d 550 (1970).

■■ The Maynards contend that the Ravettis violated the usury statute, RCW 19.52, because of the $7,000 discount imposed when the Ravettis accepted the negotiable instrument from Mabel's Tavern, Inc. We observe, initially, that usury is an affirmative defense to an action on a note. The burden of establishing usury is on the party who pleads it, and therefore was on the Maynards. *Malotte v. Gorton*, 75 Wn.2d 306, 450 P.2d 820 (1969); *McCall v. Smith*, 184 Wash. 615, 52 P.2d 338 (1935); *Bayless v. Gordon*, 123 Wash. 316, 212 P. 169 (1923); *Schmitt v. Matthews*, 12 Wn. App. 654, 531 P.2d 309 (1975). The elements of usury are set forth in *National Bank of Commerce v. Thomsen*, 80 Wn.2d 406, 410, 495 P.2d 332 (1972), quoting from *Hafer v. Spaeth*, 22 Wn.2d 378, 156 P.2d 408 (1945), as follows:

(1) a loan or forbearance, express or implied; (2) money or its equivalent constituting the subject matter of the loan or forbearance; (3) an understanding between the parties that the principal shall be repayable absolutely; (4) the exaction of something in excess of what is allowed by law for the use of the money loaned or for the benefit of the forbearance; and, in some jurisdictions, (5) an intent to exact more than the legal maximum for the loan or forbearance.

To determine whether all these essential elements are present, the courts will look through the form of the transaction and consider its substance. If all the requisites are found to be present, the transaction will be condemned as usurious, but, if any one or more of them are lacking, the parties cannot be charged with a usurious practice.

22 Wn.2d at 382.

The word "loan," this court said,

imports an advancement of money or other personal property to a person, under a contract or stipulation, express or implied, whereby the person to whom the advancement is made binds himself to repay it at some future time, together with such other sum as may be agreed upon for the use of the money or thing advanced.

22 Wn.2d at 384.

The party seeking to establish usury must produce evidence of the existence, at the inception of the contract, of each of the elements of usury. *Baske v. Russell*, 67 Wn.2d 268, 407 P.2d 434 (1965). *See* Comment, *Purchase of Note Constitutes Usurious Loan*, 41 Wash. L. Rev. 914 (1966).

■ When a note is discounted, the question arises whether the discount is in reality a device to extract greater interest than that allowed by law. *See Hynes v. Ravetti*, 80 Wn.2d 690, 497 P.2d 581 (1972); *Baske v. Russell, supra*; 45 Am. Jur 2d *Interest and Usury* § 138 (1969). *Baske v. Russell, supra*, held at page 273:

[A] note for which value has once been given can be discounted at any rate, but . . . the discount of paper for which no value has been previously given must be added to the interest provided for in determining the

interest rate, and if this exceeds the rate of interest allowed by the statute, the defense of usury is available.

Likewise, as stated in 45 Am. Jur. 2d *Interest and Usury* § 138 (1969):

> Bills and notes, like other property, may be bought and sold on such terms as may be agreed upon, on a discount at any rate, even though paid by a credit to account. A discount at any rate is not usurious if value has once been given, unless the transfer is merely a cloak for a usurious loan or violative of a usury statute covering discounts as well as loans. The question in such cases is the real substance of the transaction, and not its color and form.

(Footnotes omitted.)

■ If the $7,000 discount of the note is to be included under the facts and the law in calculating the interest payable, then the transaction was usurious; but if the discount was not includable, then the transaction was permissible. A court must consider in ascertaining whether the amount of a discount is includable as a part of the total interest charge, whether value or consideration was initially given or received for the note. If value has once been given, a note may be discounted subsequently in any amount insofar as the question of usury is concerned. In *Hynes v. Ravetti, supra,* it was noted that the makers neither received nor expected value for the note and mortgage, but that the purchaser believed he was receiving a note "for which value had already been given." *Hynes v. Ravetti, supra* at 692. Here, the trial court found specifically that full credit had been given when the Maynards received $22,000 credit for the note as part payment of the purchase price. This finding was challenged, but substantial evidence exists to support it. The trial court could conclude that in purchasing the stock of the tavern, the Maynards did not pay any cash but executed the $22,000 note as part payment. Thus, the Maynards did receive $22,000 credit or value for the note. Accordingly, under *Baske v. Russell, supra,* the subsequent discount of the note to defendant Ravetti was proper and did not make the transaction usu-

rious. The plaintiffs contend, however, that because the purchase price of the tavern was increased from $76,000 to $83,000 by the terms of a supplemental agreement between the parties, the Maynards did not receive full credit for their note. We do not find evidence to support the claim that the purchase price of the tavern was increased because of the discount of the note. The burden of proving usury was on the plaintiffs, and it was necessary for them to show that they did not receive value for the note prior to its discount. They did not sustain this burden. Although there is no requirement that the trial court make a negative finding

> where the burden of proving usury is upon the appellant, the trial court must find that each of the elements of usury exists, and the absence of such findings where the evidence is controverted amounts to a finding that such elements do not exist.

*Schmitt v. Matthews*, 12 Wn. App. 654, 659, 531 P.2d 309 (1975).

■ The defendant, on cross-appeal, challenges the first conclusion of the trial court that "Because of his participation through Dubinsky in drafting the original loan documents, Ravetti is not a holder in due course of the Maynard note." This conclusion is based upon finding No. 5, *supra*, concerning the purchase of the note by Ravetti from Liberty Mortgage Company and the observation of the trial court in its oral opinion that:

> In view of the preliminary participation of Mr. Ravetti in the preparation and approval of the documents as to form, before execution, and insofar as he was familiar with the type of security to be used, and his requesting supplemental security, which was subsequently invalidated, he did participate in the transaction and the preparation of the security documents sufficient to warrant the Court finding that he was not a holder in due course.

We find this observation to be contrary to finding No. 6. Participation in the arrangements for security for payment of the note about to be purchased is not participation in the

sale transaction or in the preparation of the note given in part payment of the sale price.

The Maynards claimed that the sellers of the tavern were guilty of fraud in inducing the contract by misrepresentations having to do with the income of the tavern, the ownership of personal property used in the tavern, and the obligations of the business. Fraud inducing entry into a contract by the payee of a note upon the maker thereof, is a defense to the maker which is cut off when the note is acquired by a holder in due course. RCW 62A.3-305; *Scandinavian American Bank v. Johnston*, 63 Wash. 187, 115 P. 102 (1911); *Jamieson & McFarland v. Heim*, 43 Wash. 153, 86 P. 165 (1906); 2 R. Anderson, *Uniform Commercial Code* §§ 3-305: 25 to 305: 36 (1971, Supp. 1973-74). Under the UCC, a holder in due course is a holder who takes an instrument for value, in good faith, and without notice that it is overdue or subject to any defense or claim on the part of any person. RCW 62A.3-302(1); *Schnitger v. Backus*, 10 Wn. App. 754, 760, 519 P.2d 1315 (1974). *See generally* Cosway, *Negotiable Instruments—A Comparison of Washington Law and Uniform Commercial Code Article 3*, 40 Wash. L. Rev. 281 (1965). RCW 62A.1-201(20) defines a holder as:

> "Holder" means a person who is in possession of . . . an instrument . . . issued or indorsed to him or to his order or to bearer or in blank.

Neither party contests the fact that the defendant is a holder or that he gave value for the instrument. The plaintiff claims that the defendant took the note with notice of defenses to it, but the trial court found to the contrary.

The remaining question is whether the defendant took the instrument in good faith. It is suggested that because of the defendant's activities as described in the findings and conclusions, he could not be a holder in due course. The parties, though not labeling the theory as such, submit the question of whether the "close connectedness" doctrine precludes Ravetti from being a holder in due course.

In J. White & R. Summers, *Uniform Commercial Code* § 14-8 (1972), the authors state at page 479:

An important recent development in holder in due course law is the rejuvenation of the "close connectedness" doctrine. Under that doctrine the purchaser of a negotiable instrument is not a holder in due course if he is too closely connected to his transferor. (The transferor is usually the payee on a note).

*Randolph Nat'l Bank v. Vail*, 131 Vt. 390, 394-95, 308 A.2d 588, 590-91 (1973), discussed the concept as follows:

The second argument raised by the appellant looks to the judicially developed doctrine of "close connectedness" through which courts have denied the purchaser of a negotiable instrument the status of a holder in due course when he has been found too closely connected to his transferor. *E.g., Unico v. Owens*, 50 N.J. 101, 232 A.2d 405 (1967); *Commercial Credit Co. v. Childs*, 199 Ark. 1073, 137 S.W.2d 260 (1940); *cf. Gramatan National Bank and Trust Co. v. Beecher*, 122 Vt. 366, 173 A.2d 163 (1961). . . .

Although the facts which give rise to a denial of holder in due course status to a lender are varied, it can be generally said it has not been applied except where there has been an inter-relationship of ownership between the seller and the lender, approval or the establishment or both of the seller's practices by the lender, reliance upon the lender by the seller amounting to a principal-agent relationship, or an independent check of the debtor's credit by the lender all in a situation where fraud of some form can be shown to be present.

*See also Morgan v. Reasor Corp.*, 69 Cal. 2d 881, 447 P.2d 638, 73 Cal. Rptr. 398 (1968); *Commercial Credit Corp. v. Orange County Mach. Works*, 34 Cal. 2d 766, 214 P.2d 819 (1950); *Gross v. Appelgren*, 171 Colo. 7, 467 P.2d 789 (1970); *Jones v. Approved Bancredit Corp.*, 256 A.2d 739 (Del. 1969); *Calvert Credit Corp. v. Williams*, 244 A.2d 494 (D.C. Ct. App. 1968); *American Plan Corp. v. Woods*, 16 Ohio App. 2d 1, 240 N.E.2d 886 (1968); 11 Am. Jur. 2d *Bills and Notes* § 440 (1963); Note, *Bills and Notes—The Close Association Doctrine Revisited*, 16 Loyola L. Rev. 457 (1969-70).

The rationale for the rule is discussed further in J. White & R. Summers, *Uniform Commercial Code* § 14-8, at 480 (1972) as follows:

> Although the legal consequences of the application of the doctrine are clear enough, namely that plaintiff is not a holder in due course and is therefore subject to defenses of the defendant, the theory upon which that legal conclusion is based and the supporting evidence required for it remain unclear. Some courts seem to proceed upon the theory that sufficiently close connection makes a seller of goods into an agent of the lender. Thus the seller's knowledge of defenses is imputed to his principal, the lender. Other courts imply that the "oneness" of the parties is tantamount to no transfer. Other courts have simply concluded that the lender is not "in good faith."

(Footnotes omitted.) *See also* 2 F. Hart & W. Willier, *Commercial Paper Under the Uniform Commercial Code* § 11.07[2] (1972). *But see* J. White & R. Summers, *Uniform Commercial Code* § 14-8n.70 (1972). In J. White & R. Summers, *Uniform Commercial Code* § 14-8, at 481 (1972), the authors state five factors which have been emphasized in applying the close-connectedness doctrine:

(1) Drafting by the lender of forms for the seller.

(2) Approval or establishment or both of the seller's procedures by the lender (e.g., setting of the interest rate, approval of a referral sales plan).

(3) An independent check by the lender on the credit of the debtor or some other direct contact between the lender and the debtor.

(4) Heavy reliance by the seller upon the lender (e.g., transfer by seller of all or a substantial part of his paper to one lender).

(5) Common or connected ownership or management of seller and lender.

The doctrine has not been specifically discussed in this state, but some decisions have alluded to its concepts. *Nissen v. Obde*, 55 Wn.2d 527, 348 P.2d 421 (1960), said that fraud between the original parties imposes upon the holder of a negotiable instrument the burden of proof that he took the note in good faith and is a bona fide holder. This case

differs from *Nissen v. Obde* in that here the trial court has found that neither Ravetti nor the broker met or dealt with any of the parties to the original transaction and Ravetti took the note without knowledge of any defense to it. The carrying of the burden of proof has been established. These facts also differentiate this case from *Bowles v. Billik*, 27 Wn.2d 629, 178 P.2d 954 (1947), where the holder was a participant in the deceit and on notice or chargeable with knowledge of the fraud.

*Marsol Credit Co. v. West Coast Grocery Co.*, 191 Wash. 134, 70 P.2d 1046 (1937), likewise condemned participation in fraud where a sham corporation set up to purchase negotiable paper was precluded from qualifying as a holder in due course. The court indicated that in such a situation the holder did not receive the negotiable paper in good faith. *See also* Cosway, *Negotiable Instruments—A Comparison of Washington Law and Uniform Commercial Code Article 3*, 40 Wash. L. Rev. 281-91 (1965).

Under the findings of fact in this case, the rationale underlying the close-connectedness doctrine is not applicable and should not be applied to preclude the defendant from recovering as a holder in due course. Following the discussion of the doctrine in *Randolph Nat'l Bank v. Vail, supra*, the court declined to apply the doctrine because the bank had no knowledge of any defense to the note at the time it was presented. Here the trial court determined that the defendant's actions in (1) obtaining a credit check of the maker prior to purchase of the note, (2) asking and receiving additional security in the form of a quitclaim deed and power of attorney from the maker, and (3) securing the obligation on the note by a mortgage on two parcels of real estate, were sufficient to deny defendant the status of being a holder in due course.

These facts, however, do not show the direct participation that is necessary to vitiate a finding of good faith or destroy the status of holder in due course. *Swanson v. Fuline Corp.*, 248 F. Supp. 364, 371 (D. Ore. 1965), states the rule thusly:

I am satisfied that in order to show a lack of "good faith" on the part of an endorsee, there must be facts showing actual and direct participation by the endorsee in the original transaction between the maker and the original payee of the note, as distinguished from an endorsee's mere furnishing of forms of notes and mortgages (being attached on the same sheet of paper), reviewal of the maker's financial statement, dealings of prior transactions, and prior commitment to purchase or discount, . . .

(Footnote omitted.) *See also Swanson v. Commercial Acceptance Corp.*, 381 F.2d 296 (9th Cir. 1967).

We hold the findings uphold the defendants' status as holders in due course. The plaintiffs' claim of fraud in the inducement is a defense that cannot prevail against a holder in due course. RCW 62A.3-305. *See generally* Cosway, *Negotiable Instruments—A Comparison of Washington Law and Uniform Commercial Code Article 3*, 40 Wash. L. Rev. 281-311 (1965). Defendants are entitled to judgment on the full amount of the $22,000 note, plus interest and attorney's fees as provided therein.

Affirmed in part, reversed in part, and remanded for entry of judgment consistent herewith.

WILLIAMS, C.J., and FARRIS, J., concur.