[No. 1416–3. Division Three. June 29, 1977.]

MANUFACTURERS ACCEPTANCE CORPORATION, *Appellant*, v. IRVING GELB WHOLESALE JEWELERS, INC., *Respondent.*

*Lukins, Annis, Bastine, McKay & Van Marter, P.S.,* *Robert G. Beaumier,* and *Keith D. Rieckers,* for appellant.

*William J. Powell,* for respondent.

MUNSON, C.J.—Appellant, Manufacturers Acceptance Corporation (MAC), originally brought this action against Emanuel Gelb, his wife, and Irving Gelb Wholesale

Jewelers, Inc. (corporation) to recover the outstanding balance of an inventory loan and to enforce the security agreement thereon. The Gelbs and the corporation counterclaimed contending that these transactions were usurious, seeking attorneys' fees and an offset for double the interest already paid on the loan. MAC dismissed Mr. and Mrs. Gelb at the outset of trial and now appeals the trial court's judgment awarding the corporation recovery under its counterclaim, discharging the security agreement and awarding attorneys' fees and costs. We affirm in part, reverse in part, and remand.

Prior to 1969, Emanuel Gelb had been employed by his cousin, Irving, as a traveling salesman in Irving's wholesale jewelry business. In August 1969, Emanuel Gelb purchased the business from Irving. As part of the transaction, Emanuel and his wife formed Irving Gelb Wholesale Jewelers, Inc.; the corporation assumed all Irving Gelb's prior business obligations and MAC released Irving Gelb from liability.

On August 19, 1969, the corporation entered into the following agreements with MAC:

1. A security agreement;
2. A factoring agreement; and
3. A management service agreement.

In addition, a document attached to the factoring agreement entitled "guaranty" was executed by the Gelbs personally guaranteeing to MAC all liabilities of the corporation. By utilizing and effecting these agreements, MAC provided the corporation with financing and management services.

The security agreement designated the corporation's inventory as security for any existing or future indebtedness to MAC, including a promissory note for over $55,000, which was Irving Gelb's prior obligation to MAC. From August 1969 through July 1973 MAC made monthly cash advances totalling $521,600 (secured by the security agreement) to the corporation. Each time a cash advance was

made, MAC prepared, and the corporation signed, a promissory note stating the amount of the cash advance and designating interest at 12 percent. Each note was due the first of the following month.

Under the factoring agreement, at the end of each month the corporation would furnish MAC with a list of all of its accounts receivable. MAC would then select from this list those accounts which it would buy. The agreement provided that MAC would remit to the corporation 80.25 percent of the purchase price of these accounts receivable, retaining 18.25 percent in a reserve account, and charging .875 percent as a factoring charge.[1] On the first of each month, MAC would apply as credit against the jewelry corporation's loan balance approximately 80 percent of accounts receivable accepted for factoring that month. Payments would likewise be debited.

MAC assisted Mr. Gelb in attempts to collect the factored accounts receivable, if necessary. From August 1969 through December 1, 1973, MAC factored accounts receivable totalling $591,135.44 and received payment on these accounts totalling $667,281.23. Based upon these factored accounts receivable, MAC has credited $553,177.34 to the corporation's outstanding loan balance.

At the beginning of each month, after MAC had credited the factored accounts, it would prepare a new note reflecting the corporation's outstanding balance and the previous month's cash advances, plus interest and service charges for the loan, the factoring agreement, and the management service agreement.

Pursuant to the management service agreement, MAC provided substantial services to the jewelry corporation. These services included assistance to Emanuel Gelb in effecting the purchase of the jewelry business from Irving Gelb; assistance in hiring and interviewing of personnel;

---

[1]These percentages total 99.375 percent, leaving a difference of .625 percent. In explaining this discrepancy, the vice–president of MAC testified that, after the corporation was advanced the 80.25 percent and the .875 percent factoring charge was deducted, the remainder was placed in the reserve account.

assistance in the collection of accounts; assistance in accounting matters; assistance in sales programming; assistance in advertising; consultation as to his customers, particularly in determining whether to extend credit to such customers; consultation on matters affecting his suppliers, including the guaranty of payment to specific suppliers; and consultation when the corporation entered the retail business. The management service agreement provided that MAC's compensation for these services be based upon two different computations: (a) a monthly fee of .875 percent of the gross amount of the accounts receivable factored by MAC; plus (b) a monthly fee of 1.187 percent of the outstanding loan balance owed by the corporation.

Emanuel Gelb's business was relatively successful until the middle of 1972. From that point on, it began to decline. Attempts to restimulate business were ineffective, and in July of 1973, MAC ceased making cash advances. MAC ultimately commenced this action December 1, 1973, alleging an indebtedness owed it of $140,948.10.

The trial court concluded that the three separate agreements were valid, that they were not so interrelated that they must, by necessity, be construed as a single transaction, that the corporation owed the amount MAC sought, but, that only .875 percent of the gross factored accounts was a reasonable fee for services rendered under the management service agreement and that the 1.187 percent charge, based upon the outstanding loan balance, was unreasonable and usurious. MAC appeals, assigning error to the court's conclusion of usury.

The trial court made the following findings to which no assignment of error is made:

15. The court further finds that Emanuel Gelb had prior business experience, had developed a familiarity with the business he purchased from his cousin during his previous work with the firm, that he had the benefit of the advice of counsel during all the period of negotiations for the purchase of the business, even though this counsel was also serving as counsel for Irving Gelb and

MAC; that Emanuel Gelb knew MAC had been functioning as a source of supply of money previous to his purchase and that he was not unaware of the ingredients of the documents he signed which specified the various service charges, factoring charges and the fact that there was a security agreement held by MAC on all inventory and proceeds.

16. The Court further finds that MAC provides a special and unique type of business financing, available to business people who may be starting without any operating capital and who otherwise could obtain no money from other lending institutions, either to purchase or operate a business. The Court further finds that Emanuel Gelb could not have obtained funds from any other lending institutions nor have obtained management service assistance such as MAC offered and supplied in this instance. Under the circumstances the court finds that Emanuel Gelb was not a captive borrower.

17. The Court finds that the total service charges collected by MAC were: factoring: $26,455.16 and notes: $61,788.07.

18. The Court further finds that the factoring of accounts receivable appears to be a reasonable method of business financing without which may [sic] businesses would not operate, and that the discount charged in this case is reasonable in the industry.

19. The Court further finds that there was a great deal of activity in way of consultation management, advice and the like on the part of MAC which activity was of value, justifying MAC in making a reasonable charge as compensation therefor.

20. The Court further finds that in the case of the promissory notes, the total interest charged exceeded 12% per annum by a small amount.

21. The Court fails to find any reasonable relationship between the service charges made on the outstanding balance of the loan and the actual services rendered by MAC.[2]

[2]MAC, in its reply brief, challenges this finding and asserts that, at best, it is a mixed finding of fact and conclusion of law, and therefore need not be set out verbatim in its brief. We are inclined to agree that this is a mixed finding and conclusion, but this fails to avoid the rule that assignments of error set out in the reply brief will not be considered. *Puget Sound Marina, Inc. v. Jorgensen,* 3 Wn. App. 476, 475 P.2d 919 (1970); CAROA 41.

And further concluded in part:

2. The Court concludes as a matter of law that the three documents signed by the parties were not so inter-related that they must by necessity be construed as one single transaction, although there are cross–references in the agreement, the Court concludes that the factoring agreement and service agreement are separate trans-action[s] from the security agreement.

3. The Court further concludes as a matter of law that the factoring arrangement is not a cover for usury, that the factoring charges are reasonable and that it was within the contemplation of the parties though not spec-ified in the factoring agreement that MAC should have the authority to make repeated discount charges and service charges monthly.

4. The Court further concludes as a matter of law that the services rendered by MAC to defendant were of a value commensurate with the service charge made under the factoring agreement.

. . .

6. The Court further concludes as a matter of law that the service charge under the management service agree-ment of 1.187% per month of the outstanding balance on the loan, was a charge made simply because of the exis-tence of the inventory loan, resulted in an additional charge for the advance of those monies of 14.244% per year, and was likewise usurious.

7. The Court further concludes as a matter of law that the principal balance due MAC is the amount of the last note of December 1, 1973, namely $140,948.10, for which sum MAC is entitled to recover.

As the corporation accurately notes, no error having been assigned, the findings are treated as verities. *Union Bank v. Kruger,* 1 Wn. App. 622, 463 P.2d 273 (1969). Nonetheless, the findings must support the conclusions. No error has been assigned to the court's failure to enter any findings on the elements of usury,[3] which are:

1. A loan or forbearance, express or implied;

---

[3]We recognize the court found in finding of fact No. 20 that the "total interest charged exceeded 12% per annum by a small amount", *i.e.,* $54.22. This was due principally to an accounting error and appears to be merely an overcharge. It is de minimis and not the usury complained of on this appeal.

2. Money or its equivalent constituting the subject matter of the loan or forbearance;

3. An understanding between the parties that the principal shall be repayable absolutely;

4. The exaction of something in excess of what is allowed by the law for the use of the money loaned or for the benefit of the forbearance; and

5. An intention to violate the law.

*Flannery v. Bishop,* 81 Wn.2d 696, 698, 504 P.2d 778 (1972); *National Bank of Commerce v. Thomsen,* 80 Wn.2d 406, 410, 495 P.2d 332 (1972); *Sullivan v. White,* 13 Wn. App. 668, 670, 536 P.2d 1211 (1975); *Schmitt v. Matthews,* 12 Wn. App. 654, 531 P.2d 309 (1975).

■■ The failure to make an express finding on a material fact is deemed to have been found against the party having the burden of proof. *Baillargeon v. Press,* 11 Wn. App. 59, 67, 521 P.2d 746 (1974).[4] A material fact is one upon which the outcome of the litigation depends. *Balise v. Underwood,* 62 Wn.2d 195, 381 P.2d 966 (1963). Since usury is an affirmative defense, the corporation had the burden of proving the elements of usury. *Malotte v. Gorton,* 75 Wn.2d 306, 450 P.2d 820 (1969); *Maynard v. England,* 13 Wn. App. 961, 538 P.2d 551 (1975). We find no evidence from which to imply a finding of the existence of all the elements.

Here, it is apparent that MAC must concede the existence of the first three elements; they form the basis for its original claim of money owing and unpaid.[5]

---

[4]We have held, however, that for the purpose of affirming a judgment, if no such finding is made and the evidence is not in conflict, the appellate court may imply the finding. *LaHue v. Keystone Inv. Co.,* 6 Wn. App. 765, 776, 496 P.2d 343 (1972).

[5]Some principles in the area of usury are:

(a) The purpose of the usury statute is to "protect those who by adversity and necessity of economic life are driven to borrow money at any cost. The protection granted is based on the fact that many borrowers are powerless to resist the avarice of the money lenders." *Baske v. Russell,* 67 Wn.2d 268, 273, 407 P.2d 434 (1965).

The trial court concluded the three agreements were not so related as to require that they be construed as one transaction. Because substantial evidence supports such findings and conclusions, we are bound by them. *Johnson v. Safeway Stores, Inc.,* 1 Wn. App. 380, 382, 461 P.2d 890 (1969). The effect of this is to negate any inference that the service agreement was a mandatory prerequisite to the advancement of any money secured by the corporate inventory. Furthermore, the court found that MAC had performed valuable services under its service agreement, and was entitled to a reasonable fee.[6] But after finding: (1) that both parties freely entered into valid separate contracts; (2) that the corporation was not a captive borrower; and (3) that valuable services were performed, the court erred in applying the usury laws. There is no evidence to support, nor did the court find, either that a requirement of the loan was the execution of the service agreement or that the service agreement was a sham or camouflage used to extract an illegal rate of interest for the use of the money advanced. The court found the fee under the service agreement was unreasonable—that the corporation had bargained for and paid an exorbitant fee; but it failed to find that the fee under the service agreement was extracted for the use of the money loaned under the security agreement.

(b) "[T]he law has regard only for the actual facts, and searches for the real transaction between the parties, disregarding evasions, subterfuges and all kinds and varieties of camouflage." *Home Sav. & Loan Ass'n v. Sanitary Fish Co.,* 156 Wash. 80, 91, 286 P. 76 (1930); *accord, Busk v. Hoard,* 65 Wn.2d 126, 135, 396 P.2d 171 (1964); *National Bank of Commerce v. Backstrom,* 1 Wn. App. 881, 465 P.2d 189 (1970);

(c) In determining whether a contract is usurious, if the contract can be construed as lawful or unlawful, the former construction will be adopted. *German Sav., Bldg. & Loan Ass'n v. Leavens,* 89 Wash. 78, 82–83, 153 P. 1092 (1916) and *Simpson v. C.P. Cox Corp.,* 167 Wash. 34, 37, 8 P.2d 424 (1932).

(d) "[T]he character of a contract with respect to usury is determined at the time the contract is made; and, if the contract in its inception is unaffected by usury, it cannot be invalidated by a subsequent transaction." *Hafer v. Spaeth,* 22 Wn.2d 378, 383, 156 P.2d 408 (1945); *Clausing v. Virginia Lee Homes, Inc.,* 62 Wn.2d 771, 775, 384 P.2d 644 (1963).

[6]We are inclined to agree with the trial court that the fees charged under the service contract were unreasonable, *i.e.,* $88,243.23.

The court correctly concluded that the fee was related to the inventory loan "simply because of the existence of the inventory loan"; however, the findings do not support a conclusion that the fee was for the purpose of obtaining a greater interest on the money loaned. Parties are free to contract for any fee, or to relate that fee to any index, upon which they mutually agree. The fact that this fee was financially unwise for one party does not give the court power to alter the contract, unless the fee violates a statutory provision. No statute was violated here. Having concluded that the usury law was improperly applied, we need not consider MAC's other assignments of error.

We affirm that portion of the judgment awarding MAC the principal balance due on its promissory note, reverse that portion of the judgment: (a) awarding the corporation money damages pursuant to the penalties for usury; (b) satisfying MAC's security agreement, and (c) awarding the corporation attorneys' fees and costs. We remand for a determination of the attorneys' fees due MAC under its note and security agreement.[7]

GREEN and McINTURFF, JJ., concur.

Petition for rehearing denied August 17, 1977.

Review denied by Supreme Court February 3, 1978.

---

[7]The security agreement contained a provision allowing reasonable attorneys' fees to MAC for both trial and appeal. Therefore, MAC is entitled to attorneys' fees for services rendered both at the trial and on appeal. *Corinthian Corp. v. White & Bollard, Inc.*, 74 Wn.2d 50, 442 P.2d 950 (1968); *Ranta v. German*, 1 Wn. App. 104, 459 P.2d 961 (1969).