[No. 1914-1. Division One. April 22, 1974.]

J. C. BAILLARGEON et al., Respondents, v. A. G. PRESS et al., Appellants.

John M. Watson, for appellants.

Kelleher, Murphy & Nelson and Richard Kelleher, for respondents.

SWANSON, C.J.—J. C. and Astri Baillargeon sued their next-door neighbors, A. G. and Jean Press, seeking a judgment requiring the removal of an existing 6-foot-high cedar grape stake boundary line fence, and prohibiting the proposed construction of similar additional fencing along the remainder of the boundary line separating their properties. The suit was founded on the claims that the existing fence constitutes a nuisance and any additional fencing not only would amount to a nuisance but also would violate RCW 7.40.030, the "spite fence" statute. The Baillargeons also claimed a prescriptive right to the boundary line area and asserted that the Presses sought to interfere with this right by construction of the fence and the cutting of trees and plants in the area. The Presses counterclaimed for certain damages and for removal of an encroachment previously placed upon their property by the Baillargeons.

The genesis of this lawsuit is a series of misunderstandings that arose between the parties who own adjoining properties located on the west side of Lake Washington Boulevard East in Seattle, Washington. The misunderstandings apparently began when the Baillargeons cut down a large cedar tree which was approximately 1.8 feet from the property line, but which the Presses mistakenly thought was situated on their property.[1] In approximately February

---

[1]The trial court analyzed the parties in its oral opinion, stating in part:

"This is one of these cases that can't be decided without close observation of the parties concerned, and when decided, results in everybody feeling insulted. . . . [T]he plaintiff is a person who is very precise, and has many of those qualities that public media criticize bankers for, not really, but in the way in which he reacts to certain things. Everything, I think, must be exactly as he wants it.

"On the other hand, the defendants, particularly represented by Mrs. Press, are really interested in privacy from everybody, and she is really upset by the circumstances of these occurrences, but I don't think she had any right to be. She did not have the patience which is required of any human being under any circumstances almost that arose during this case.

"Now, you get a precise person against a nervous and disturbed person of that nature, and you have nothing but trouble, and I don't

1971, the Presses constructed a 6-foot-high grape stake fence above a concrete block rockery or retaining wall adjacent to the property line which the trial court described in finding of fact No. 8 as "beautiful and expensive" and "necessary to do something to the gap created by cutting down the cedar tree." Subsequently, the Presses decided to extend the 6-foot fence all the remaining distance to Lake Washington Boulevard East at the front of the properties. The Baillargeons objected to a continuation of the same kind of fencing along the property line, apparently because of its proximity to their house and the "blank billboard" effect they believed it would create, but negotiations between the parties to seek an alternative means of screening the properties were unsuccessful. When the Presses made preparations to proceed with the extension of the fence, the Baillargeons brought suit and secured a temporary injunction.

After a trial to the court, which included a viewing of the property by the trial judge under a stipulation of the parties that the judge could regard whatever he saw as evidence, a judgment was entered restraining the Presses from constructing any fence beyond that which already existed, and dismissing with prejudice both the claim of the Baillargeons for an adverse or prescriptive easement and the counterclaim of the Presses for damages and the removal of the encroachment. In a commendable effort to resolve permanently the controversy between the parties,

think anything I do here is going to solve that trouble. They have to solve it themselves.

"It seems to me that this misunderstanding, and I think really what it all amounts to is a tempest in a teapot, arose out of a series of misunderstandings. I doubt if they could have been resolved by any communication between these parties because some kind of a blow-up would have occurred with these two personalities." After describing the grape stake fence as beautiful, expensive and necessary, the court referred to the cutting of the cedar tree and stated: "At the time it was done, I'm sure Mrs. Press thought it was her cedar tree, or at least she had a right to do something about it, and she didn't at all. And I think that set her off. All of the actions from then on by both parties flow from that misunderstanding."

the trial court also included in its judgment an order appointing an architectural firm as a special master, at the expense of the Baillargeons,

> to investigate the site, and gather any other information said master feels is necessary for the purpose of proposing to this Court a possible treatment for the development of the area of the property line.

The court's judgment went on to recite that the court, after considering the special master's report and other evidence, would "enter judgment as to what treatment by fence or otherwise would be proper in the area . . ."[2] The Presses appeal.

In order to reach immediately what we conceive to be the determinative issue in this case, we pass appellants' first assignment of error, which challenges certain of the trial court's findings of fact, and move directly to a consideration of appellants' second assignment of error which amounts to an assertion that the trial court misconstrued or unconstitutionally misapplied the law surrounding RCW 7.40.030, the "spite fence" statute, which provides:

> An injunction may be granted to restrain the malicious erection, by any owner or lessee of land, of any structure

---

[2]The parties raise no issue as to the court's authority to appoint such a special master, and we express no opinion on the subject. In its oral opinion, the trial court explained its decision to name a special master as follows: "[I]t is my opinion that tentatively, because we haven't really discussed this problem legally or practically, that proposals for the development of that area of the property line, to provide defendants with the privacy to which they are entitled and to provide the plaintiffs with the most attractive and least darkening treatment of that area, should be considered by both parties and, if necessary, submitted for decision to the Court. If necessary, I say, because of course, it is better if landscape architects and parties decide these questions than do uneducated, inexperienced judges in these matters. I have in mind that there may be some possible treatment of the property line itself which will provide these two essentials. . . . What I am trying to do here now is give some guidelines for the submission of a proposal to perform, if necessary, a decreed type of treatment that would satisfy the present property owners without any implication of future rights to these parties or their successors in interest except as may possibly be res adjudicata [sic] or as the product of an agreement. I hope that the Court will have nothing to do but to confirm an agreement."

intended to spite, injure or annoy an adjoining proprietor. And where any owner or lessee of land has maliciously erected such a structure with such intent, a mandatory injunction will lie to compel its abatement and removal.

In short, the question presented is as follows: Assuming arguendo that the trial court's findings of fact are supported by substantial evidence and therefore are to be regarded as verities, do such findings support the trial court's conclusion that appellants' proposed fence violates the provisions of RCW 7.40.030 and therefore must be enjoined?

In the early American decisions, the common-law approach of the English courts to the problem of the malicious use of property was followed and spite fences were held to be legal on the theory that so long as the use of the property was otherwise legal the motive of the user was not a proper subject for judicial inquiry. In *Burke v. Smith*, 69 Mich. 380, 37 N.W. 838 (1888), however, an equally divided court held that a screen erected solely to shut out the light and view from the neighbor's window should be abated as a nuisance. The court characterized the erection of the screen as a wanton infliction of damages and concluded that no person has a legal right to erect a useless structure for the sole purpose of injuring his neighbor.[3] Since *Burke v. Smith, supra*, the majority of courts which have passed on the question have held that spite structures

[3]The *Burke* court stated, in part, at page 389:

"There is no doubt in my mind that these uncouth screens or 'obscurers,' as they are named in the record, are a nuisance, and were erected without right, and for a malicious purpose.

"What right has the defendant, in the light of the just and beneficent principles of equity, to shut out God's free air and sunlight from the windows of his neighbor, not for any benefit or advantage to himself, or profit to his land, but simply to gratify his own wicked malice against his neighbor? None whatever.

"The wanton infliction of damage can never be a right. It is a wrong, and a violation of right, and is not without remedy.

"The right to breathe the air, and to enjoy the sunshine, is a natural one; and no man can pollute the atmosphere, or shut out the light of heaven, for no better reason than that the situation of his property is such that he is given the opportunity of so doing, and wishes to gratify his spite and malice towards his neighbor."

serving no useful purpose, but causing injury to the owner or occupant of adjoining premises, constitute private nuisances. *See generally* 5 R. Powell, *The Law of Real Property* § 696 (1971); 1A G. Thompson, *Real Property* § 239 (1964); Annot., 133 A.L.R. 691 (1941). For a discussion of the relevancy of motive in the relations of adjoining landowners, *see* Comment, 26 Cal. L. Rev. 691 (1938).

■ In the case at bar, although the trial court made no specific finding that the Presses' proposed fence would constitute a private nuisance, the court did conclude that RCW 7.40.030 was violated. This statute, enacted in 1883, withstood constitutional attack in *Karasek v. Peier,* 22 Wash. 419, 426, 61 P. 33 (1900), in which the court observed that the maxim that "every one must so use his own property as not to injure the rights of others" is based upon the state's police power to preserve and promote the public welfare even at the expense of private rights, and concluded:

> In the exercise of police power the legislature may, to a reasonable extent, and with due regard to the public welfare, prohibit or regulate the use of private property; but any provision or regulation of the use and enjoyment of land by the owner which is not limited to the prevention of nuisances is opposed to constitutional principles; and the power of the legislature to prohibit nuisances is confined to the prohibition or regulation of such acts as violate, or materially interfere with, the rights of others.

(Citations omitted.) The court recognized that the language of the statute is sufficiently broad to authorize an injunction against a landowner to prevent him from constructing a dwelling house or business on his property, providing his motive in so doing is malevolent, but that such an interpretation of the statute would render it unconstitutional because it would have the effect of depriving an owner of his property without due process of law and compensation. The *Karesek* court determined, however, that the statute may be applied constitutionally, and stated at page 428:

But, inasmuch as it must have been well known to the

legislature that useful and valuable structures, such as houses, are rarely or never erected merely to annoy or injure an adjoining owner, we feel justified in holding that it was not the intention to prohibit the erection of such structures as really enhance the value, usefulness, or enjoyment of land, but such only as are primarily or solely intended to injure or annoy an adjoining owner, and which serve no really useful and reasonable purpose.

The *Karasek* court determined at page 430 that "malevolence was the dominant motive" in the defendant's decision to erect a fence 8 to 9 feet high, that the defendant had conceded that a 5-foot-high fence would be equally beneficial to him as the higher one, and therefore affirmed the trial court's order cutting the height of the existing fence to 5 feet.

Our state Supreme Court again had occasion to consider the requirements for an injunction under RCW 7.40.030 in *Jones v. Williams,* 56 Wash. 588, 106 P. 166 (1910), where the court was faced with the question of whether the erection of a garage and storeroom on the street line of a lot violated the statute. The court, after reviewing its holding in *Karasek,* concluded there was no such violation because the buildings were of benefit to the landowner and therefore his motive in constructing the buildings was irrelevant. The court stated at page 594:

When an owner is proceeding to construct a building upon his land which in some measure enhances the value, usefulness, and enjoyment of the land, and the same is not a nuisance, as the allegations of this complaint fairly construed show, his motives cannot be assigned as a legal reason for preventing such construction.

(Citations omitted.)

More recently, in *McInnes v. Kennell,* 47 Wn.2d 29, 35, 286 P.2d 713 (1955), a waterfront property owner sought to compel his neighbor to remove a pier and fences erected along the boundary line, but the court upheld the trial court's finding that the pier and the fences " 'were not erected through any malevolence of purpose or malicious motive or intent' " and, therefore, concluded that RCW

7.40.030 was inapplicable. Moreover, with respect to the issuance of an injunction, the court stated at page 38:

> A mandatory injunction is a harsh remedy, and courts of equity will not resort to it unless the right thereto is clear. Rights of adjoining landowners in the use and enjoyment of their property are relative, but they are also equal. Equity cannot restrict one landowner to confer a benefit on the other. It is only when an unreasonable or unlawful use of land by one property owner infringes upon some right of another in the reasonable use and enjoyment of his land that equity will intervene.

(Citation omitted.)

We conclude that in order to apply the spite fence statute, RCW 7.40.030, to restrain the erection of a fence or other structure or to abate an existing structure, the court must find (1) that the structure damages the adjoining landowner's enjoyment of his property in some significant degree; (2) that the structure is designed as the result of malice or spitefulness primarily or solely to injure and annoy the adjoining landowner; and (3) that the structure serves no really useful or reasonable purpose.

In applying these principles to the case at bar, an examination of the trial court's findings, which for the purposes of this opinion we have assumed to be supported by substantial evidence, reveals that the fence in question would damage respondents' property and would be erected by the appellants with the malicious intention to annoy the respondents; however, there is no clear finding that the appellants' fence would not serve a really useful or reasonable purpose.[4]

---

[4] The record reflects the fact that the trial judge was presented with the clear opportunity to make such a finding at the time findings and conclusions were presented; however, nearly a year had elapsed since the oral opinion had been rendered and the trial court apparently believed that, under such circumstances, fairness to the parties required that the findings be no more specific than the oral opinion and therefore declined to modify the proposed findings. The relevant findings which were entered state as follows:

Thereafter, in May of 1971, the defendants with an intention to

■■ The failure of the trial judge to make an express finding on a material fact requires that the fact be deemed to have been found against the party having the burden of proof. *McCutcheon v. Brownfield*, 2 Wn. App. 348, 467 P.2d 868 (1970). *See LaHue v. Keystone Inv. Co.*, 6 Wn. App. 765, 496 P.2d 343 (1972). We hold that the question of whether or not the appellants' proposed fence would serve a really useful or reasonable purpose is a question of material fact, and therefore the failure of the trial court to resolve the question in an express finding in favor of respondents, who had the burden of proof, requires reversal.[5]

Appellants also assign error to the trial court's dismissal of their cross complaint for certain alleged damages and for

---

seriously annoy the plaintiffs, which intention had commenced at the time of the cutting of the tree, threatened and planned to put up a six foot fence commencing on the property line between the plaintiffs and defendants as designated by a red mark on plaintiffs' Exhibit 1 at the approximate intersection of the property line and the existing rockery where the words "end ret. wall clear by 0.2 feet" is, extending easterly all the way to Lake Washington Blvd. E., in front of the properties. This proposed fence was enjoined by the temporary injunction of this Court heretofore properly issued. Erection of such a fence would be a malicious act by the defendants, and such structure was intended to annoy the plaintiffs adjoining property owner.
Finding of fact No. 10.

Such a fence as set out in the prior paragraph, if erected by the defendants, would be because of the growth between the properties, completely out of the defendants' sight. It would not add to the privacy and protection of their property and would close in the plaintiffs' front porch area and that portion of their home which is within a few feet of that boundary area between the properties of the parties hereto. It would also seriously impair the aesthetic value, the use, and the value of the plaintiffs' property.
Finding of fact No. 11.

[5]We would emphasize, however, particularly in view of the trial court's appointment of a special master, that the judgment appears to reflect an effort by the court to effect a compromise of the present controversy. In view of the apparent waste of money and manpower involved in this litigation, we share the trial court's hope that the parties will be able to resolve their differences over the proposed fence between their properties and reach a mutually acceptable decision as to

the removal of the encroachment. The trial court found that the encroachment caused the appellants no damage, and they assign no error to this finding which is supported by substantial evidence. It is apparent from the record that the remaining claims in the cross complaint were correctly dismissed for lack of evidence.

Finally, appellants contend that, under the terms of a stipulation entered into by the parties, they are entitled to an award of reasonable attorney's fees. The effect of this stipulation has not been determined by the trial court, and therefore we remand for that purpose.

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

JAMES and CALLOW, JJ., concur.

Petition for rehearing denied August 1, 1974.

Review denied by Supreme Court October 18, 1974.

---

how the boundary line area will be utilized. We are reminded of the words of Robert Frost in "Mending Wall":

. . .
I let my neighbor know beyond the hill;
And on a day we meet to walk the line
And set the wall between us once again.

. . .
There where it is we do not need the wall:
He is all pine and I am apple orchard.
My apple trees will never get across
And eat the cones under his pines, I tell him.
He only says, "Good fences make good neighbors."

. . .
"Why do they make good neighbors? Isn't it
Where there are cows? But here there are no cows.
Before I built a wall I'd ask to know
What I was walling in or walling out,
And to whom I was like to give offense.
Something there is that doesn't love a wall,
That wants it down." . . .

. . .
He says again, "Good fences make good neighbors."

From "Mending Wall" from *The Poetry of Robert Frost* edited by Edward Connery Lathem. Copyright 1930, 1939, 1969 by Holt, Rinehart & Winston, Inc. Copyright 1958 by Robert Frost. Copyright 1967 by Lesley Frost Ballantine. Reprinted by permission of Holt, Rinehart & Winston, Inc.