# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

MIT D. TILKOV and SUSAN L. TILKOV, in their individual capacities and as a marital community; TIBOR GAJDICS; KATHRYN LYNNE COTTER; and SANDRA D. HULME,

    Appellants/Cross-Respondents,

v.

DAVID L. DUNCAN, in his individual capacity; BLACK PINES, LLC, a Washington limited liability company,

    Respondents/Cross-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Nos. 69615-7-I
69615-7-I
70092-8-I
(Consolidated Cases)

DIVISION ONE

UNPUBLISHED OPINION

FILED: July 28, 2014

---

SPEARMAN, C.J. — Neighboring property owners dispute: (1) the existence of individual easements across David Duncan's and Black Pines' properties, benefitting Mit Tilkov, Tibor Gajdics, Kathryn Cotter, Sandra Hulme, and unnamed class members (collectively, "the class members"); and (2) whether certain trees and fences on the Duncan and Black Pines properties are spite structures erected in violation of RCW 7.40.030.

The trial court dismissed the class members' express and prescriptive easement claims on the parties' cross motions for summary judgment. We reverse, in part, finding that the class members are entitled to judgment on their prescriptive easement claims.

Tilkov and Cotter substantially prevailed in a bench trial on the spite structure claims. We reverse, in part, because insufficient evidence supports the trial court's conclusion that a fence extender along the Black Pines-Tilkov property line is a spite structure.

## FACTS

Many of the facts relevant to this case were established in an earlier lawsuit against Duncan to enforce an express easement granted to Bell's Grove Property Owners of Point Roberts (BGPOPR), a nonprofit corporation of which the class members are all members.

David Bell originally owned all the property at issue in this and the BGPOPR action, including large tracts to the north and south of a Whatcom County right-of-way (Edwards Drive) and adjoining beachfront. He never formally subdivided the land; however, in the 1950s and 1960s, Bell sold 58 lots on the north side of Edwards Drive (Bell's Grove) to individual purchasers. He retained an open area between the 58 upland lots as open space (the "reserve"). He also retained a large tract located between the beach and the southern border of Bell's Grove that had lots on either side of Edwards Drive.

Adam Burhoe purchased one of the Bell's Grove lots in 1953. Burhoe created an informal plan of survey identifying the Bell's Grove lots, the lots retained by Bell and the "reserve."

The class members' predecessors-in-interest acquired their properties by individual deed from Bell. Included in these deeds was language that generally allowed the grantees access over Bell's land to the beach.[1] These deeds did not prescribe a specific route by which the purchaser was to access the beach.

In 1962, Bell sold the "reserve" to BGPOPR to be used as a common area for the 58 Bell's Grove lots. The deed in this transaction included language granting an easement for beach access similar to that in the class members' individual deeds. However, the BGPOPR deed was more specific about the location of the easement, describing it as "the area lying between the extended north and south lines of the conveyed tract from the southerly portion of the conveyed tract to the beach."

In 2000, Duncan acquired the large tract retained by Bell. He subdivided the property and, in 2009, he conveyed the lots north of Edwards Drive to Black Pines LLC, of which he is the sole owner.

---

[1] The class members' deeds refer to this easement in slightly different variations of grammar and structure, but in substance are all the same:
> The purchaser is to have the perpetual privilege of foot gravel [sic] to and from the said property to the tide flats on the Beach, for recreational use; this easement to apply to foot paths over the reserve on the Grantor's said plat, and extends to the second party, Grantees, heirs, executors and administrators and assigns.

(The Tilkov easement.)

-3-

Easement Claims

In the 1960s, Bell's Grove residents accessed the beach using the "original path," which was essentially a straight line down the middle of the "reserve," also known as "Bell's Grove Common Area," through Bell's retained lots. In the early 1970s, the residents changed their route slightly, with Bell's permission. They began using the "historic path," which veers away from the original path in a southeasterly bearing on the south side of Edwards Drive.[2] In 2003, Duncan closed off the historic path and provided a new access path, which lay slightly east of and parallel to the "original path" on the north side of Edwards Drive. South of Edwards Drive, the path veered sharply toward the eastern boundary of Duncan's property, which it followed to the beach.

In 2005, BGPOPR sued Duncan to establish an exact location of BGPOPR's easement and alternatively pursued a claim for a prescriptive easement along the historic path. In 2007, the trial court entered a judgment, finding that BGPOPR had an express easement for a footpath in the area between the extended north/south lines from Bell's Grove Common Area, across Duncan's and Black Pines' properties to the beach.

Duncan has designated a path in compliance with the 2007 judgment. The path is currently in use by Bell's Grove residents, including the class members. The portion of the path on the Black Pines property does not line up with the portion on the Duncan property. Although BGPOPR did not appeal the 2007 judgment, it moved the trial court to require that the two segments of the path line up. During this process, Duncan

---

[2] This historic path routed traffic away from Bell's campground business.

-4-

represented to the court that members of BGPOPR could use any portion of the right-of-way they wished. The trial court in the BGPOPR action reserved ruling on the motion.[3]

Although the class members are all members of BGPOPR, the BGPOPR action concerned only the rights granted under the deed to BGPOPR. Any rights granted under the deeds to the individual lot owners were not litigated in that case. However, BGPOPR was represented in the proceeding by its president, Tilkov. The trial court in the BGPOPR action rejected BGPOPR's claim for a prescriptive easement over the historic path, concluding that use of that path had been permissive, not hostile. The trial court also rejected BGPOPR's claim that the easement was at whatever fixed, specific route BGPOPR desired.

In the present action, the class members, in their individual capacities,[4] assert claims similar to those raised by BGPOPR. They seek recognition of an easement, either by express grant or by prescription, over the original path. Duncan and Black Pines contend that the class members' easement claims are barred by res judicata and/or collateral estoppel and that the class members have only a floating easement, satisfied by the path created in 2007 following the BGPOPR action.

Spite Structure Claims

In 2003, prior to the commencement of the BGPOPR action, Duncan planted 30 to 40 cypress trees in several forest-like, uneven rows along Edwards Drive on the Duncan

---

[3] The record does not disclose that the trial judge in either the BGPOPR matter or the present case ever resolved this issue.

[4] On Duncan and Black Pines' motion, the trial court certified a class representing all of the Bell's Grove residents who possess grants of easement substantially similar to the Tilkov easement.

property (the cypress grove). He also began building a six-foot-high wire fence along the common boundaries between the Black Pines property and the properties owned by Tilkov and Cotter.

Duncan also planted 30 poplar trees (the poplar grove) prior to commencement of the BGPOPR action. The Poplar grove consisted of three rows of ten trees running north to south on lot 1 of the Black Pines property, which lies directly south of the Cotter property. As a part of a later installation of a septic mound on lot 1, Duncan relocated some of the poplars near the shared boundary with the Cotter property and included them as part of an expanded grove that added two additional rows running north to south on the east side of the original grove. These additional two rows of poplars were planted after the BGPOPR action concluded.

After the 2007 judgment in the BGPOPR action, Duncan planted a row of 16 cypress trees along the northern border of the Black Pines property, within 10 feet of the Tilkov and Cotter property lines (the 16 cypress trees). He also began to fill in the fence with wood. In 2010, he began installing a solid, one-foot-high "extender" on the fence where it borders the Tilkov property.

At trial, the class members maintained that the cypress grove, poplar grove, 16 cypress trees, and fence extender are spite structures, erected in violation of RCW 7.40.030. The trial court concluded that the poplar grove on the Black Pines property was not a spite structure within the meaning of RCW 7.40.030, but the 16 cypress trees and fence extender were. The court ordered Duncan and Black Pines to abate the 16 cypress trees and fence extender and entered a permanent injunction against installation of any

fence, plant, or hedge above six feet in height within ten feet of the property line shared with Tilkov and Cotter.

The trial court also concluded that RCW 7.40.030 applies only to structures located "directly contiguous" to land owned by the complaining party. The trial court therefore precluded recovery against Duncan (for claims related to the cypress grove) because his property is not contiguous with the class members' properties. The trial court also precluded recovery by Hulme and Gajdics against Black Pines (for claims related to the poplar grove, the 16 cypress trees, and the fence extender) because the Black Pines property is not contiguous with the Hulme or Gajdics properties.

The parties all challenge the judgment.

## DISCUSSION

### Easement Claims

The class members claim that the trial court erred in dismissing their motion for summary judgment and entering judgment in favor of Duncan and Black Pines on the easement claims. They argue that, at a minimum, a genuine issue of material fact exists as to whether they possess an express or prescriptive easement over the original path.

We review summary judgment decisions de novo. Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). A genuine issue of material fact exists if "reasonable minds could differ on the facts controlling the outcome of the litigation." Ranger, 164 Wn.2d at 552.

-7-

When determining whether an issue of material fact exists, the court must construe all facts and inferences in favor of the nonmoving party. Id.

In response to the class members' claims, Duncan and Black Pines first assert that summary judgment was proper because the easement claims are barred by the doctrine of res judicata or collateral estoppel.

Res judicata precludes the relitigation of claims that were litigated, or could have been litigated, in a prior action. Loveridge v. Fred Meyer, Inc., 125 Wn.2d 759, 763, 887 P.2d 898 (1995). Although Duncan and Black Pines nominally asserted the defense of res judicata in their answer to the class members' complaint, they failed to raise the issue in their motion for summary judgment or in response to the class members' motion. This failure waives the issue on appeal and we decline to consider it. Milligan v. Thompson, 110 Wn. App. 628, 633, 42 P.3d 418 (2002).

Similar to res judicata, the doctrine of collateral estoppel prevents parties from being allowed to have a "second bite at the apple" and relitigate issues that were resolved in a prior dispute. The doctrine precludes only those issues that have actually been litigated and finally determined in the earlier proceeding. Shoemaker v. City of Bremerton, 109 Wn.2d 504, 507, 745 P.2d 858 (1987). Collateral estoppel applies where the following elements exist:

> "1) the issue decided in the prior adjudication must be identical with the one presented in the second; (2) the prior adjudication must have ended in a final judgment on the merits; (3) the party against whom the plea of collateral estoppel is asserted must have been a party or in privity with a party to the prior litigation; and (4) application of [the] doctrine must not work an injustice."

State v. Mullin-Coston, 152 Wn.2d 107, 114, 95 P.3d 321 (2004) (emphasis omitted) (quoting State v. Bryant, 146 Wn.2d 90, 98-99, 42 P.3d 1278 (2002)).

Here, Duncan and Black Pines cannot satisfy the first requirement because they fail to establish that the issues presented in this case are the same as those litigated in the BGPOPR action. In the BGPOPR action Duncan stipulated that "the rights granted under the individual deeds to the lot owners were not the subject of" the lawsuit. Additionally, the prescriptive easement claims in the two cases almost certainly involve different evidence and infringement of different rights because the claims relate to different paths (BGPOPR claimed prescriptive rights over the so-called historic path; here, the class members claim prescriptive rights over the original path).

Because the class members' easement claims are not barred by res judicata or collateral estoppel, we consider them on the merits.

Duncan and Black Pines asserted at trial, and maintain on appeal, that the express grants of easement in the class members' individual deeds fail because they insufficiently describe the subservient estate and therefore violate the statute of frauds. See Berg v. Ting, 125 Wn.2d 544, 551, 886 P.2d 564 (1995); RCW 64.04.010, .020. The class members respond that there is at least a genuine issue of material fact on this issue.

In order to satisfy the statute of frauds, a grant of easement must describe the burdened property in terms "'sufficiently definite to locate it without recourse to oral testimony, or else it must contain a reference to another instrument which does contain a sufficient description.'" Berg, 125 Wn.2d. at 551 (quoting Bigelow v. Mood, 56 Wn.2d 340,

341, 353 P.2d 429 (1960)).[5] Duncan and Black Pines argue that the class members' grants do not meet this standard and consequently fail as a matter of law. They note: (1) there is no legal description of the "reserve" in evidence and (2) the said plat was not recorded and did not exist as a legally recorded plat at the time the deeds were granted.

Berg involved a grant of easement across portions of two properties that the owners sought to subdivide. Because the easement was meant to burden only certain plots in the future subdivision and not the entire property, the parties described the burdened estate by reference to "a future 'finally approved' short plat application," a document that would not exist until almost four years after the grant of easement. Berg, 125 Wn.2d at 549. Our Supreme Court held that reference to a then nonexistent instrument was insufficient to describe the burdened property. Id. at 551.[6]

Here, the class members' deeds provide:

The purchaser is to have the perpetual privilege of foot travel to and from the said property to the tide flats on the beach, for recreational use; this easement to apply to foot paths over the reserve on the [Grantor's][7] said plat of the Party of the First Part, and extends to the second party, Grantees, heirs, executors, administrators and assigns. . . .

---

[5]This requirement does not mandate that the area comprising the easement be described in a conveying document. An easement may be "floating" on the servient property, meaning the easement's location need not be directly established in the conveying document. However, while the easement itself can be "floating," the servient estate must still be sufficiently described in order to comply with the statute of frauds. Berg, 125 Wn.2d at 551.

[6] In Berg, examination of the referenced document further disclosed why the description was insufficient. Although the grant of easement as drafted referenced portions of "lot G" in the burdened property, there was no lot G in the finally approved short plat. Id. at 549. Additionally, "the finally approved short plat the purported easement appear[ed]...to be located entirely on lot E, but the grant describe[d] no easement over lot E." Id.

[7] Cotter's grant of easement omits the "Grantor" term in describing the "said plat."

(Tilkov easement) (Emphasis added.) The record contains no legal description of the "reserve." And while, under Berg, such a description is not required if the burdened property is otherwise sufficiently described, here, the description of the burdened property is inadequate. The "said plat"[8] named in the grants was not recorded at the time of the conveyance, nor was it identified in the grants by reference to landmarks, boundaries, or other identifiable markers. The only "reserve" identified in the record is that noted on the map prepared by Burhoe. But that identification is not helpful because (1) only one of the class members (Hulme) acquired a deed prior to the creation of the map, (2) there is no indication in the record that Bell ever saw the map or was aware of the use of the term "reserve" therein, and, (3) to the extent the "reserve" area is indicated in the map, it provides no access to the beach. Thus, the description of the burdened property contained in the class members' deeds is ambiguous.

The class members argue that any ambiguity in the description could have been resolved by expert testimony.[9] However, we rejected a similar argument in Berg v. Ting, 68 Wn. App. 721, 728, 850 P.2d 1349, 1353 (1993), rev'd on other grounds, 125 Wn. 2d 544, 556-62, 886 P.2d 564 (1995). In Berg, the class members argued that before determining whether the grant of easement's ambiguous description of the burdened property satisfied the statute of frauds, the trial court should have determined by extrinsic

---

[8] Aside from the plan of survey created by Burhoe, the record contains no plat map of the properties at issue.

[9] To this end, they offered the declaration of Dennis DeMeyer, a surveyor who interpreted the grant language "as identifying two different locations burdened by the easement": (1) the portion of Bell's remaining land that lay between the upland lots and the tide flats, represented in the plan of survey as lots 61 and 62 (Duncan and Black Pines' properties) and (2) the tract marked as "reserve" on the plan of survey.

evidence the parties' intentions regarding the location of the relevant tracts. Id. The court explained that trial courts are not required, as a general matter, to look beyond a written conveyance to extrinsic evidence in order to determine the parties' intentions. Id.[10] Thus, the trial court was not obligated to consider extrinsic evidence that could potentially save the express grants of easement in this case.

In the alternative, the class members argue that the grants of easement here are removed from the statute of frauds under the equitable doctrine of part performance. We disagree.

The doctrine of part performance empowers Washington courts to enforce an agreement to convey an estate in real property that does not satisfy the statute of frauds if equity and justice so require. Id. at 571 (citing Miller v. McCamish, 78 Wn.2d 821, 826, 479 P.2d 919 (1971)). We consider three factors to determine if there has been part performance of the agreement sufficient to remove it from the statute of frauds: (1) delivery and assumption of actual and exclusive possession; (2) payment or tender of consideration; and (3) the making of permanent, substantial, and valuable improvements referable to the contract. Id. In applying the doctrine of part performance to an express grant of easement that failed to comply with the statute of frauds, the Berg court explained:

> [T]he three factors of part performance will have diminished probative value because possession will never be exclusive, and making valuable improvements will often be inconsistent with limited rights granted.

_____

[10] Citing Snyder v. Peterson, 62 Wn. App. 522, 526-28, 814 P.2d 1204 (1991), the court noted that such inquiry is appropriate in cases where the deficient description is the result of a scrivener's error or a mutual mistake.

> [However], it does not follow that consideration alone should be sufficient part performance to take a grant of easement out of the statute of frauds. Although the part performance doctrine . . . is a flexible doctrine, its evidentiary function must be preserved, and we will not abandon that function simply because the doctrine may be difficult to apply in certain situations.

Id. at 559.

In the present matter, we find no reason to fashion an equitable remedy despite evidence that the first two part performance factors are present. There is no evidence that either party will be unjustly enriched by the failure to recognize an express easement in this case or that the class members will otherwise be harmed if such a right is not recognized. To the contrary, the evidence tends to establish that whether or not the class members have an express easement, they have access to the beach via the path created pursuant to the 2007 judgment in the BGPOPR action.

Because the class members have failed to establish that the grants of easement satisfy the statute of frauds or merit removal from the statute under the doctrine of part performance, their express easement claims fail as a matter of law. Duncan and Black Pines were entitled to judgment on this issue.

We reach a different conclusion with respect to the class members' prescriptive easement claims. A prescriptive easement exists when a nonowner's use of the servient estate is: (1) open and notorious, (2) over a uniform route, (3) continuous and uninterrupted for 10 years, (4) hostile or adverse to the owner of the land sought to be subjected, and (5) with the knowledge of such owner at a time when he was able in law to assert and enforce his rights. Kunkel v. Fisher, 106 Wn. App. 599, 602, 23 P.3d 1128

-13-

(2001). Application of the elements is a mixed question of law and fact. Chaplin v. Sanders, 100 Wn.2d 853, 863, 676 P.2d 431 (1984). In the present case, the relevant facts are uncontested, and the parties only dispute whether the elements of "hostility" and "continuous use" were met.

With respect to the "hostility" requirement, Duncan and Black Pines argued below[11] that use of the original path could not be hostile because Bell intended the class members and their predecessors-in-interest to use the original path pursuant to the individual deeds. However, we have held that use of land pursuant to a grant, which does not comport with the statute of frauds but was, nevertheless, meant to convey a permanent right of use, will still be considered "hostile" to the owner. Lee v. Lozier, 88 Wn. App. 176, 183, 945 P.2d 214 (1997); see also Crescent Harbor Water Co. v. Lyseng, 51 Wn. App. 337, 342, 753 P.2d 555 (1988) ("When the owner of a servient estate confers upon another the right to use that property as if it had been legally conveyed, the resultant use is made under a claim of right, rather than by permission") (emphasis added). Here, it is undisputed that Bell intended to convey a "perpetual privilege" of use of the original path. Thus, at the outset, the use of the original path by the class members and their predecessors-in-interest was hostile. However, this hostile use terminated at the time of the 1962 grant of the BGPOPR easement, under which the class members or their predecessors-in-interest acquired a right to use the original path as members of BGPOPR. Consequently, in order for the class members to satisfy the "continuous use"

---

[11] On appeal, Duncan and Black Pines do not respond to the class members' prescriptive easement claim. However, they argued the issue in their motion for summary judgment before the trial court.

element of prescription, they must demonstrate continuous and uninterrupted use of the original path during the 10-year period from 1952 (or earlier) to 1962.

The record establishes that Tilkov, Gajdics, and Cotter do not meet this requirement because none of their predecessors-in-interest acquired the property before 1952. However, Hulme testified that her predecessors-in-interest— her parents—purchased the property in 1951 and used the original path every summer at least through 1962. Additionally, Gabriel Hill, a class member who was deceased at the time of the summary judgment proceedings, testified in the BGPOPR action that he first started spending summers at a cabin in Bell's Grove in the early 1930s. He testified that he accessed the beach from Bell's Grove via the original path. Thus, Hulme and Hill establish that their use of the original path was continuous and uninterrupted for the relevant 10-year period from 1952 to 1962.

We conclude as a matter of law that Hulme and Hill have established an easement by prescription. We further conclude, based on the unchallenged order certifying the class, that the prescriptive rights thus established are applicable to the entire class.[12] The trial court's entry of judgment for Duncan and Black Pines on this issue was error.

Spite Structure Claims

Duncan and Black Pines contend that the trial court erred in entering judgment for Tilkov and Cotter. They argue first that trees are not "structures" within the meaning of RCW 7.40.030 and, second, that insufficient evidence supports the conclusion that the 16

---

[12] We note that the trial court converted the proceeding to a class action on motion of Duncan and Black Pines and that Duncan and Black Pines do not contest the class members' assertion that the use of the land by any class member can be relied upon to establish the prescriptive rights of the entire class.

cypress trees and the fence extender are spite structures erected in violation of the statute. The class members claim that the trial court erred when it precluded Gajdics and Hulme from recovery under the statute based on the conclusion that RCW 7.40.030 applies only to structures located "directly contiguous" to land owned by the complaining party.

We review de novo the trial court's application of the statute. Okeson v. City of Seattle, 150 Wn.2d 540, 548-49, 78 P.3d 1279 (2003). When a statute is unambiguous, construction is not necessary and the plain meaning controls. Faben Point Neighbors v. City of Mercer Island, 102 Wn. App. 775, 778, 11 P.3d 322 (2000).

Duncan and Black Pines claim that the trial court erred in concluding that the 16 cypress trees are "structures" within the plain meaning of RCW 7.40.030. They argue that the plain meaning of "structure" unambiguously means something artificial and built, i.e., a fence, building, or edifice, and not trees, which are "naturally grown." Br. of Resp'ts' at 35. In support of this argument, they cite Karasek v. Peier, 22 Wash. 419, 426, 61 P. 33 (1900).

In Karasek, the trial court found that appellant's fence violated the spite structure statute and ordered its removal. On appeal, appellant argued that a fence was not a structure as that term is used in the statute.[13] Our Supreme Court rejected the argument, citing the definition of "structure" in the Century Dictionary, which read, "'In the broadest sense, a structure is any production or piece of work artificially built up or composed of

---

[13] The statute, as cited in that case, is section 5433 of Ballinger's Code (2 Hill's Code of Procedure section 268) and is virtually identical to RCW 7.40.030.

-16-

parts joined together in some definite manner; any construction.'" Karasek, 22 Wash. at 425. Respondents contend that because the definition cited by the court contained the word "artificially," it necessarily follows that a configuration of trees cannot be a structure. We disagree. First, the Karasek court did not consider the question presented here, i.e., whether an artificial configuration of trees could constitute a "structure" under the statute. And second, we do not read the cited definition as excluding a fence-like structure made of living instead of artificial parts. The current Webster's Third New International Dictionary is consistent with this view. It defines "structure," in relevant part, as: "2.b: something made up of more or less interdependent elements or parts: something having a definite or fixed pattern of organization." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2267 (2002). Thus, no distinction is drawn between structures consisting of natural versus man-made or artificial parts.

Additionally, since Karasek, this court has concluded that a row of trees planted along a property line might be legally equivalent to a fence or wall. In Lakes at Mercer Island Homeowners Ass'n v. Witrak, 61 Wn. App. 177, 181-82, 810 P.2d 27 (1991), we determined that whether a row of trees planted along a property line constituted a fence was a question for the fact finder. Although we did not consider the spite structure statute in Lakes, our reasoning—if a row of trees looks and acts like a fence, then courts can treat it like a fence—is instructive here.[14]

---

[14] Duncan and Black Pines cite Dalton v. Bua, 47 Conn. Supp. 645, 648, 822 A.2d 392 (2003), noting that the Connecticut Supreme Court interpreted a similar spite structure statute, and one that preexisted Washington's law, to not apply to hedges or trees. In light of the above-cited Washington authority, it is apparent that Washington courts depart from the Connecticut interpretation of "structure."

We conclude that when in artificially arranged configurations, trees can form a "structure," as that term is used in RCW 7.40.030. The trial court did not err in so concluding.

We also find no error in the trial court's conclusion that RCW 7.40.030 applies only to structures located "directly contiguous" to land owned by the complaining party.

RCW 7.40.030 (emphasis supplied) provides in relevant part: "An injunction may be granted to restrain the malicious erection, by any owner or lessee of land, of any structure intended to spite, injure or annoy an adjoining proprietor." The class members argue that the trial court improperly applied the "contiguous" language in lieu of the statutory "adjoining" language. But their own briefing makes plain that "contiguous" and "adjoining" are synonyms: "The dictionary definition of contiguous is 'being in actual contact: touching along a boundary or at a point.' www.merriam-webster.com/dictionary. Whereas, adjoining is defined as 'touching or bounding at a point or line.' www.merriam-webster.com/dictionary." Br. of Appellant at 41-42. These definitions are nearly identical and convey substantially the same meaning. The class members assert, "The definitive distinction between the two words is the requirement in 'contiguous' for there being actual contact or touching." Br. of Appellant at 42. However, given that both definitions cite "touching" at a boundary as the key characteristic, the contention is meritless.

---

Additionally, Dalton is distinguishable because that case involved allegations that a hedge had been maliciously allowed to grow to great heights. Id. at 648. The plaintiffs in Dalton did not object to the actual planting of the hedge, they only wanted it to be maintained at a given height. Id. The Dalton court expressly noted that the issue was distinct and "significantly different" from a claim of malicious planting, as is present here. Id.

We conclude that the trial court appropriately limited relief under the statute. All of the class members were precluded from recovery against Duncan (for claims related to the cypress grove) because his property is not contiguous with the class members' properties. Hulme and Gajdics were also precluded from recovery against Black Pines (for claims related to the poplar grove, the 16 cypress trees, and the fence extender) because the Black Pines property is not contiguous with either the Hulme or Gajdics property.

Next, we consider the trial court's conclusions with respect to the alleged spite structures located on the Black Pines property—the poplar grove, the 16 cypress trees, and the fence extender. "When a trial court has weighed the evidence . . ., appellate review is limited to determining whether substantial evidence supports its findings of fact and, if so, whether the findings support the trial court's conclusions of law." Hegwine v. Longview Fibre Co., 132 Wn. App. 546, 555, 132 P.3d 789 (2006). "The substantial evidence standard is deferential and requires the appellate court to view all evidence and inferences in the light most favorable to the prevailing party." Lewis v. Dep't of Licensing, 157 Wn.2d 466, 468, 139 P.3d 1078 (2006).

The standard for proving entitlement to relief under RCW 7.40.030 is:

(1) that the structure damages the adjoining landowner's enjoyment of his property in some significant degree; (2) that the structure is designed as the result of malice or spitefulness primarily or solely to injure and annoy the adjoining landowner; and (3) that the structure serves no really useful or reasonable purpose.

Baillargeon v. Press, 11 Wn. App. 59, 66, 521 P.2d 746 (1974).

The class members claim that the trial court's conclusion that the poplar grove is not a spite structure under RCW 7.40.030 is error because it is not supported by substantial evidence. Although they do not expressly address the Baillargeon factors on appeal, the record discloses that there was conflicting evidence at trial regarding the first two Baillargeon factors.[15]

With respect to the first factor, the class members contend that the poplars—which will grow 40-50 feet in height with a spread of 30 feet at maturity—obstruct air and light on the Cotter property. However, they also admit that the nearest row of poplars is 24 feet away from the shared property line with Black Pines.

With respect to the second factor, the class members claim the size of the trees in and of itself evinces malice or spite and that, with respect to the two rows of trees planted after the BGPOPR judgment, the timing indicates that they were planted primarily or solely to injure and annoy Cotter. However, they assign no error to the trial court's findings that (1) tree planting is Duncan's hobby, (2) he began planting the poplar grove well before the BGPOPR action commenced, and (3) the two relocated rows were planted in order to accommodate a septic mound installed on the Black Pines property. Accordingly, these findings are verities on appeal. Keever & Assocs., Inc. v. Randall, 129 Wn. App. 733, 741, 119 P.3d 926 (2005).

The trial judge, as trier of fact in the bench trial, was entitled to weigh the inconsistencies and the credibility of the evidence. Lodis v. Corbis Holdings, Inc., 172

---

[15] We note that the trial court correctly identified this standard in its conclusion of law 2.

Wn. App. 835, 861, 292 P.3d 779 (2013). And this court may not substitute its evaluation of the evidence for that made below. Goodman v. Boeing Co., 75 Wn. App. 60, 82-83, 877 P.2d 703 (1994). We conclude that viewed in the light most favorable to Duncan and Black Pines (the prevailing parties), the evidence and inferences therefrom are sufficient to support the trial court's conclusion that the poplar grove is not a spite structure.

Next, Duncan and Black Pines claim the trial court erred in concluding that the 16 cypress trees form a structure erected in violation of RCW 7.40.030. We reject the argument because the trial court's conclusion that the three Baillargeon factors were met is supported by its findings, which, in turn, are supported by substantial evidence.

The trial court found the cypress trees will mature to create a 60- to 70-foot-high wall directly in front of the Tilkov and Cotter properties, which would limit "in significant degree" the light and air available to portions of each property. Duncan and Black Pines assign error to this finding, but the undisputed evidence shows that (1) the 16 cypress trees will likely reach heights of 60 to 70 feet and have a spread 15 to 25 feet wide, (2) the trees were planted within 10 feet of the Tilkov and Cotter property lines, and (3) the trees were organized in "a row" along the Cotter boundary and "an irregular staggered row" along the Tilkov boundary. This evidence is more than sufficient to sustain the trial court's conclusion that 16 trees formed a structure that significantly damaged Tilkov's and Cotter's ability to enjoy their property.

Substantial evidence also supports the trial court's conclusion that the 16 cypress trees were planted with malice or spitefulness primarily or solely to injure and annoy the adjoining landowners. The trial court properly took into account its unchallenged findings

regarding the size and arrangement of the trees and their proximity to the property line. In addition, the trial court found that, unlike the poplar grove, the cypress trees were planted after the ongoing conflict between the parties began.

Substantial evidence also supports the trial court's finding that the 16 cypress trees serve no reasonable or useful purpose, as required under the third prong of Baillargeon. Duncan and Black Pines argue that Duncan planted the trees for their beauty and privacy and that, "[i]n addition to their aesthetic value, trees provide a number of other valuable services, including, inter alia, protection from wind and soil erosion, prevention of water pollution, providing shade, and serving as habitat for wildlife." Br. of Resp'ts' at 40. However, the trier of fact was entitled to disbelieve this contention. See Lodis, 172 Wn. App. at 861. This is especially so in light of the undisputed evidence that at the time of planting, Duncan and Black Pines' properties already had the benefit of at least two groves consisting of over 60 trees, and Duncan's privacy was already safeguarded by a six-foot wooden fence along the Tilkov and Cotter property lines.

Because the record contains substantial evidence of each of the Baillargeon factors, we find no error in the trial court's determination that the 16 cypress are spite structures.

With respect to the fence extender, Duncan and Black Pines renew their objections under the second and third Baillargeon factors and also claim insufficient evidence supports a finding of the first factor. We agree with the latter contention.

The trial court failed to articulate a basis for concluding that the fence extender blocked light or air on the Tilkov property to any appreciable degree. Moreover, no

evidence was presented that it did. On the contrary, Tilkov testified that while the seven-foot fence with the extender darkened his property, it did not block light from his windows. He also testified that there was "an unbroken mass of vegetation" on his side of the Black Pines fence line, which he maintained at a height somewhere between 12 and 20 feet. Verbatim Report of Proceedings, (July 31, 2012) at 67-68. Thus, there was no evidence that the fence extender had an effect on the light and air of the Tilkov property separate from that attributable to the six-foot fence and Tilkov's own vegetation or that it otherwise limited Tilkov's enjoyment of his property as required under Baillargeon. We therefore find insufficient evidence supports the trial court's conclusion that the fence extender is a spite structure.

## CONCLUSION

We hold that the express grants of easement in the class members' individual deeds fail because their ambiguous description of the subservient estate does not satisfy the statute of frauds. Additionally, there is no basis in this case for removal of the grants from the statute of frauds based on part performance. But we conclude that as a matter of law, the class members have a prescriptive easement over the original path and they are entitled to judgment. We remand for entry of judgment consistent with this opinion.

And while we affirm the trial court's rulings as to whether Tilkov and Cotter were entitled to relief under RCW 7.40.030 with regard to the poplar grove and the 16 cypress trees, we reverse the trial court's ruling with respect to the fence extender because there is no articulable basis for concluding that the fence extender limited Tilkov's use and enjoyment of his property, in violation of the statute.

-23-

Duncan and Black Pines request attorney fees and costs pursuant to RAP 18.9(a), which authorizes the appellate court to order a party or counsel who files a frivolous appeal to pay sanctions, including an award of attorney fees and costs to the opposing party. See Yurtis v. Phipps, 143 Wn. App. 680, 696, 181 P.3d 849 (2008) (citing Rhinehart v. Seattle Times, Inc., 59 Wn. App. 332, 342, 798 P.2d 1155 (1990)). An appeal is frivolous when it presents "no debatable issues upon which reasonable minds might differ and . . . is so devoid of merit that there is no possibility of reversal." Lutz Tile, Inc. v. Krech, 136 Wn. App. 899, 906, 151 P.3d 219 (2007). We deny the request because the issues presented in this appeal are not frivolous.

Remand for entry of judgment consistent with this opinion.

_Spearman, C.J._

WE CONCUR:

_Leach, J._                    _Appelwick, J._